2021 IL App (4th) 200373-U

NOS. 4-20-0373, 4-20-0374, 4-20-0375, 4-20-0376, 4-20-0377, 4-20-0378 cons.

NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 6, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* N.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 18JA188 |
| v.    (No. 4-20-0373) | ) | 18JA189 |
| Patreace S., | ) | 18JA190 |
| Respondent-Appellant). | ) | 18JA191 |
| | ) | 18JA192 |
| | ) | 18JA193 |
| *In re* T.A., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-20-0374) | ) | |
| Patreace S., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* T.S., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-20-0375) | ) | |
| Patreace S., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* Na. S., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-20-0376) | ) | |
| Patreace S., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |

In re L.S., a Minor )
)
(The People of the State of Illinois, )
        Petitioner-Appellee, )
        v.   (No. 4-20-0377) )
Patreace S., )
        Respondent-Appellant). )
)
)
*In re* D.S., a Minor )
)
(The People of the State of Illinois, )
        Petitioner-Appellee, )
        v.   (No. 4-20-0378) )     Honorable
Patreace S., )     Karen S. Tharp,
        Respondent-Appellant). )     Judge Presiding.

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the judgments of the trial court that terminated
respondent's parental rights because the trial court's findings were not against the
manifest weight of the evidence.

¶ 2      Respondent, Patreace S., is the mother of N.S. (born October 2008), T.A. (born

July 2012), T.S. (born June 2011), Na.S. (born May 2013), L.S. (born December 2016), and D.S.

(born March 2018). In September 2018, the State filed separate petitions for adjudication of

wardship, alleging that the minors were neglected. In November 2018, respondent stipulated the

minors were neglected.

¶ 3      In January 2020, the State filed petitions to terminate respondent's parental rights

in each case. The petitions alleged, in part, that respondent was an unfit parent because she failed

to make reasonable progress from November 2018 to August 2019.

¶ 4      In July 2020, the trial court conducted the fitness portion of the termination

proceedings at which the State presented evidence that respondent had ongoing substance abuse

and domestic violence problems. Following arguments, the court found that respondent had failed to make reasonable progress from November 2018 to August 2019.

¶ 5        Immediately following the fitness proceedings, the trial court conducted proceedings regarding whether it was in the minor children's best interests to terminate respondent's parental rights. Both sides presented evidence, and following arguments, the court found that it was in the minors' best interests that respondent's parental rights be terminated.

¶ 6        Respondent appeals, arguing that the trial court's (1) fitness determinations and (2) best-interest determinations in each case were against the manifest weight of the evidence. We disagree and affirm the court's judgments.

¶ 7                                I. BACKGROUND

¶ 8                              A. Procedural History

¶ 9        In September 2018, the State filed separate petitions for adjudication of wardship, alleging, in relevant part, that N.S., T.A., T.S., Na.S., L.S., and D.S. were neglected minors. In November 2018, the trial court conducted an adjudicatory hearing at which respondent stipulated to the allegations that the minors' environment was "injurious to their welfare as evidenced by the unsanitary conditions of the home." Later that month, the trial court conducted a dispositional hearing and ordered that respondent must (1) cooperate with the Department of Children and Family Services (DCFS), (2) comply with the terms of the service plan, and (3) correct the conditions that required the minors to be in care.

¶ 10                          B. The Termination Hearings

¶ 11        In January 2020, the State filed petitions to terminate respondent's parental rights as to each child. The petitions alleged that respondent was an unfit parent because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare,

(2) make reasonable efforts to correct the conditions which were the basis for removing the minors from respondent's care, and (3) make reasonable progress toward the return of the minors within the nine-month period from November 2018 to August 2019. 750 ILCS 50/1(D)(m)(i), (ii) (West 2016). Because our conclusion involves only the last allegation, we will discuss only the facts relevant to that determination.

¶ 12                                    1. *The Fitness Proceedings*

¶ 13          In July 2020, the trial court conducted the fitness portion of the termination proceedings to address respondent's parental fitness.

¶ 14                                    a. Amber Jones

¶ 15          The State called as a witness Amber Jones, who testified that she was a child welfare specialist with DCFS. She was assigned to respondent's case in September of 2018 and was the current caseworker at the time of the hearing. Jones stated she established an initial service plan for respondent in September 2018 and gave this plan to respondent that same month at respondent's home. (We note that the service plan for each child was substantially the same and Jones's testimony was applicable to each child.) Respondent was required to complete services including (1) a substance abuse assessment, (2) a mental health assessment, (3) a domestic violence assessment, and (4) parenting classes. Respondent would also have to (1) maintain a legal means of income, (2) maintain stable housing, and (3) cooperate with the agency. Jones discussed with respondent what she needed to do to complete these tasks and made all the necessary referrals so that respondent could complete her services.

¶ 16          Jones testified that in March 2019, there was an administrative case review (ACR) at which time respondent had not cooperated with her substance abuse assessment because she failed to appear at scheduled appointments in November 2018 and January 2019. Respondent

also had problems with her random drug tests because she failed to appear for them or tested positive for tetrahydrocannabinol (THC). Respondent also failed to attend her scheduled mental health assessment screening in November 2018. Jones believed that respondent cooperated because she signed the necessary releases of information and met with Jones. However, respondent did not have stable housing or a legal means of income. For parenting classes, respondent was referred to The Parent Place but was dropped in January 2019 because she failed to appear. Jones explained that respondent was re-referred to The Parent Place but was again dropped in April 2019.

¶ 17            Jones testified that a second service plan was created from March 2019 to September 2019, and the tasks respondent would have to complete were the same as in the previous plan. Jones explained that throughout the life of the case there were 75 supervised visits with the minors but respondent only attended 39 of those visits. Jones never personally observed any visits. Jones also had not been made aware of respondent having ever sent any gifts, cards, or letters to the minors.

¶ 18            Jones testified that she had regular contact with respondent both in person and by phone. When they spoke, Jones would discuss respondent's service plan and what services still needed to be completed. Jones explained that she was never close to returning the minors to respondent's care because respondent was never able to maintain safe and appropriate housing or a legal means of income. Further, respondent was dropped from mental health services, domestic violence services, and substance abuse services and never corrected the conditions that brought the minors into care.

¶ 19            On cross-examination, Jones testified that the reason the minors came into care in September 2018 was because of inadequate shelter and environmental neglect. Jones explained

that "raccoons were falling through the ceiling. The children were sitting in a car and not wanting to go inside, and there was a rat infestation."

¶ 20          When asked about respondent's lack of legal means of income, Jones explained that during the first service plan, respondent claimed she worked at McDonald's. However, Jones had asked respondent to provide pay stubs and respondent never did so, which resulted in Jones's concluding respondent had no legal means of income during the first service plan. During the second service plan, Jones was able to confirm that respondent was working at McDonald's, but Jones did not know how long respondent had been working there.

¶ 21          Jones further testified that her determination that respondent attended only 39 of the 75 visits was based on Ruth Kirkpatrick's notes. Kirkpatrick was the supervisor of the visits, and she documented that the visits were "chaotic" and respondent had difficulty parenting the six children. Respondent looked to the oldest daughter, N.S., to help her parent. The notes also showed that snacks and meals were not provided at the visits as required. Jones recalled several instances in which DCFS or Kirkpatrick cancelled a visit but claimed that respondent was offered opportunities to make up those canceled visits.

¶ 22          Jones testified that respondent completed the substance abuse assessment during the second service plan in June 2019 and that respondent was recommended for outpatient treatment, which she started at Gateway in July 2019. However, respondent failed to successfully complete the outpatient treatment and was dropped for non-attendance in December 2019. Respondent also completed her domestic violence assessment and was required to attend domestic violence classes. The classes began in September 2019, but respondent was eventually dropped in December 2019 because of non-attendance.

¶ 23                              b. Respondent

¶ 24    Respondent testified on her own behalf and said she had contacted DCFS in September 2018 because her roof collapsed while it was raining and her sister had informed her there were raccoons in the house. Respondent removed the minors from the house, took them to her mother's house, and called animal control. After animal control removed the animals the following day, respondent contacted DCFS, and an investigator told her that if she cleaned up the insulation and had the landlord board up the holes, she and the minors could return to the home. However, the following morning another person came to the home, told respondent the home was hazardous, and took protective custody of the minors.

¶ 25    Respondent claimed she first met Jones a week later around September 10 or 11 and, at that time, respondent learned of the first service plan. Respondent also claimed that Jones did not give her a copy of the service plan until February 2019 and that she had to ask multiple times before receiving it. She acknowledged, however, that Jones told her what services she had to complete in September 2018.

¶ 26    Respondent testified that she completed a substance abuse assessment from Family Guidance Center in March 2019 but did not receive any documentation from them regarding the assessment. Family Guidance said that at that time, respondent did not need treatment. After speaking with Jones, respondent got another assessment in June 2019.

¶ 27    Respondent claimed she was engaged in parenting classes at The Parent Place during the first service plan but could not remember when she began the classes. Respondent disagreed with Jones that respondent was dropped because of nonattendance. Instead, respondent said that she had been late a few times and, on those occasions, they would not let her in the building. Ultimately, respondent acknowledged that she (1) did not complete her parenting classes during the first service plan, (2) was dropped because of tardiness, and (3) should have

been on time. She also acknowledged she attended either 10 or 11 out of 16 classes during that time.

¶ 28    Respondent testified that she did not complete a domestic violence assessment until 2019 because she did not think she needed the services. Respondent acknowledged that she was not employed until May 2019. Respondent testified that she completed a mental health assessment in May 2019 and claimed that she called Jones during the assessment and let her speak with the counselor who told respondent that she did not need classes at that time.

¶ 29    Respondent testified that she lived in various hotels until she eventually moved into a new residence in March 2019. DCFS gave her no assistance in finding housing.

¶ 30    Respondent claimed that Jones's testimony about her visits was inaccurate. She brought food and gifts for her children and claimed that they would often leave with bags full of things she had given them. She also claimed she attended more than half of her visits and, for at least 15 of the other visits, she would get a call from Jones right before the visit cancelling it. Respondent disputed Jones's claim that she was not properly attentive to the minors.

¶ 31    Respondent testified that she did well in an outpatient substance abuse treatment program but did not successfully complete the program due to COVID-19. She claimed she reengaged in parenting classes at The Parent Place during the time period of the second service plan and successfully completed the program in either September or October 2020. Respondent said she went to the first two domestic violence classes but did not continue them because her work schedule interfered with the classes.

¶ 32    On cross-examination, respondent acknowledged that she did not complete a substance abuse assessment prior to September 2019 because she believed it was not necessary at the time. Respondent also testified she attempted to get a mental health assessment prior to May

2019 but did not do so because of a problem with her medical card; however, she claimed that when that problem was resolved she got the assessment.

¶ 33    The parties rested, and the trial court continued the proceedings.

¶ 34                    c. The Trial Court's Ruling

¶ 35    In August 2020, the trial court further conducted the fitness proceedings, received the parties' arguments, and ruled as to the issue of fitness.

¶ 36    The trial court noted that respondent's substance abuse problems had not been resolved because she had (1) missed her first two scheduled intake appointments, (2) tested positive for cocaine in March 2019, and (3) started outpatient treatment in July 2019 but was dropped in December 2019. The court noted that respondent's mental health problems had not been resolved because she (1) failed to attend her mental health assessment in November 2018 and (2) did not provide documentation of other mental health services. The court also noted that respondent's domestic violence problems were not resolved.

¶ 37    The trial court found that the State proved by clear and convincing evidence that respondent "did not make reasonable progress because [the court] could not say by the end of the nine-month period that [respondent] was close to being able to have the children returned to her care." Accordingly, the court found respondent was an unfit parent.

¶ 38                    2. *The Best Interest Proceedings*

¶ 39    Immediately following the fitness proceedings, the trial court conducted a hearing regarding whether it was in the minors' best interests to terminate respondent's parental rights.

¶ 40                    a. N.S. and T.S.

¶ 41    Amber Jones testified that N.S. and T.S. were placed in foster care together in September 2018. The couple they were placed with, the Doerings, were not relatives; instead, it

was a specialized placement due to the minors' ongoing behavioral issues, and the minors were making progress in the placement. Jones stated that the placement addressed the minors' educational, religious, social, and medical needs.

¶ 42    Jones testified that the minors had friends in their placement. They lived with their foster parents and foster sibling. The Doerings were willing to provide permanency and planning for the minors' futures and were committed to adopting them if they were not returned to respondent. The minors showed attachment and affection to the Doerings, and the Doerings showed affection in return. The minors felt safe with the Doerings. Jones saw a connection between the minors and the Doerings and noted that the minors refer to them as "mom and dad."

¶ 43    Jones explained that because respondent had only attended approximately half of her visits with the minors, their bond was lacking. Jones also said the notes she reviewed indicated that respondent's visits with the minors were chaotic and unstructured and that N.S. had to help assist with supervising the younger children. Jones opined that it was in N.S. and T.S.'s best interests that respondent's parental rights be terminated.

¶ 44    On cross-examination, Jones testified that N.S. and T.S. were originally in a traditional placement but were transferred to a specialized placement because they had exhibited hyper-sexualized and defiant behavior. Jones explained that N.S. and T.S. were making progress in their current placement because of their schoolwork, counseling, and a reduction of the problematic behaviors, which were still occurring but less frequently. Jones acknowledged that N.S. and T.S. are African-American and that the Doerings are Caucasian; however, she stated she had no concerns about N.S. and T.S.'s identities because their cultural needs were being met through extra-curricular activities and interactions with family friends who were African-American.

¶ 45                                    b. T.A.

¶ 46        Jones testified that in December 2019, T.A. was placed with a person named Laura Wakeman, who was a fictive kin placement, because the minors consider Wakeman their godmother. T.A. was making progress in her placement and her educational, religious, social, and medical needs were being met. T.A. lived in Wakeman's four-bedroom home with Wakeman and her three children.

¶ 47        Jones reported that T.A. exhibited affection and a feeling of safety towards Wakeman, and Jones had heard T.A. call Wakeman "mom." Wakeman was committed to adopting T.A. if T.A. were not returned to respondent. Wakeman was able to provide permanence and a plan for T.A.'s future.

¶ 48        Jones testified that T.A.'s attachment with respondent was lacking due to the missed visitations over the life of the case. Jones believed that termination of respondent's parental rights was in T.A.'s best interest.

¶ 49        On cross-examination, Jones testified that T.A. was placed with Wakeman without any of her other siblings but, pursuant to DCFS policy, the siblings were allowed to interact with each other for at least four hours per month. Further, the minors were able to see each other often because Wakeman went to the same church as the Doerings and the Impsons, the remaining children's foster parents. Jones acknowledged that she had not asked the minors if they wanted to see each other or respondent more often. Jones stated that Wakeman was T.A.'s godmother and respondent's family friend. T.A. was "spoiled because she is the baby of [Wakeman's] house." She got along very well with Wakeman's three children, and the children "talk about what a joy it is to have [T.A.] placed in their home."

¶ 50        Jones explained that she had no concerns about Wakeman, who is Caucasian,

raising T.A., who is African-American. Jones noted that if DCFS did not believe a foster parent could provide for the child's cultural needs, the placement would not have gone forward. Jones again noted the relationship Wakeman had to T.S. as her godmother and a family friend. Jones was satisfied that T.A.'s cultural and ethnic needs would be met.

¶ 51                                        c. Na.S., L.S., and D.S.

¶ 52           Jones testified that in September 2018, Na.S., L.S., and D.S., were placed with Brianne and Joseph Impson. This was neither a relative nor specialized placement, but all the minors were making progress in this placement. The placement attended to the minors' educational, religious, social, and medical needs. The minors stayed with the Impsons in a home with six bedrooms, along with the Impsons' five children. Na.S. had her own room, while L.S. and D.S. shared a room. Jones had observed attachment between the minors and the Impsons, and she saw connection and affection between them. The minors appeared to feel safe with the Impsons and called them "mom and dad." The Impsons were willing to provide permanency because they were committed to adopting the minors if they were not returned to respondent.

¶ 53           Jones explained that the minors lacked attachment to respondent due to the missed visits over the life of the case. Jones believed it was in the minors' best interests that respondent's parental rights be terminated.

¶ 54                                        d. Respondent's Testimony

¶ 55           Respondent testified that the minors all had attachment with her and she knew this because they often told her they loved her at visits and at their meetings via videoconferencing software. She said that the minors said they wanted to be with her and they had never told her they wanted to be adopted.

¶ 56           Respondent said she had last seen the children in August 2020, just three days

prior to the hearing. Jones took a group photo of respondent and the minors. Respondent acknowledged she was late to the visit. She claimed Jones was only at the visit for approximately 10 minutes after respondent arrived. Respondent testified the minors call her "mom" and acknowledged that the minors call their foster parents "mom and dad."

¶ 57        Respondent testified that she was concerned about her children not being in the same home. She said she had a good relationship with the Impsons and Wakeman but described that she had disagreements with Ms. Doering. Respondent said she had some concerns about her children being raised by Caucasian parents who may not be able to assist the children with their hair or other things related to the children's understanding of their background.

¶ 58                              e. Patrick Ward's Testimony

¶ 59        Patrick Ward testified he was a friend of respondent's for four years and he described respondent's loving relationship with the children. He also recounted times, particularly a birthday party, during which respondent interacted well with the children.

¶ 60                              f. The Trial Court's Ruling

¶ 61        The trial court began by noting that it considered all of the statutory best interest factors. The court said, "I may not have touched upon all of them, but I have been here thinking about all of them, how they play into this case." The court noted, "Obviously, right now [the minors] are safe, secure, being cared for, provided for[,] all of those things."

¶ 62        In relation to the development of the minors' identities, the trial court said, "we have six children who are *** black children with white families, and I understand, yes, there are some issues there. There are cultural issues there." However, the court stated that "the children do have friends they see at camp, at church who share their same culture, and I think that is very important."

- 13 -

¶ 63 In relation to "where the children actually themselves feel love, attachment[,] and sense of being valued, *** their sense of security, their sense of familiarity, the continuity of affection," the court recognized, "the children love their mother very, very much." The court stated that the minors had been in foster care for nearly two years, which was significant because of the minors' young ages, ranging from 2 to 11 years old. The court noted Jones's testimony that attachment between the minors and respondent was lacking because of missed visits. The court also noted, "[T]hese children themselves related plans that they have for their future that involve the foster parents, and it didn't involve [respondent], how they see themselves, where they see themselves, and I think that's very, very telling." The court described the impact of the missed visits, stating, "It sends a message that [the minors] are not important."

¶ 64 In relation to the minors' need for permanence, the trial court said that even if respondent only missed 25% of her visits, "these kids need to know who is going to be there for them 100% of the time, who is going to be there for them day in day out."

¶ 65 The trial court determined that the State had shown by a preponderance of the evidence that it was in the minors' best interests that respondent's parental rights be terminated.

¶ 66 Following the termination of respondent's parental rights in all six cases, respondent appealed, and this court consolidated the cases on appeal for consideration.

¶ 67                                      II. ANALYSIS

¶ 68 On appeal, respondent argues that the trial court's (1) fitness determinations and (2) best-interest determinations in each case were against the manifest weight of the evidence. We disagree and affirm the trial court's judgments.

¶ 69                              A. The Fitness Determinations

¶ 70 Respondent argues the trial court's findings that the State proved all three grounds

of unfitness by clear and convincing evidence in each case were against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's findings that respondent failed to make reasonable progress within the applicable nine-month period were not against the manifest weight of the evidence. Accordingly, we discuss only those findings.

¶ 71                                  1. *The Standard of Review*

¶ 72          A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 73                                  2. *Reasonable Progress*

¶ 74          The State must prove unfitness as defined in section 1(D) of the Adoption Act by clear and convincing evidence. 750 ILCS 50/1(D) (West 2016); *N.G.*, 2018 IL 121939, ¶ 28. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2016). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's

- 15 -

directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001)). Likewise, this court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991); see also *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 75　　　　　　　　　　3. *The Trial Court's Findings in This Case*

¶ 76　　　　　　Here, the State presented evidence that respondent was supposed to complete (1) a substance abuse assessment, (2) random drug screens, (3) a mental health assessment, (4) parenting education classes, and (5) a domestic violence assessment. Respondent also was to (1) obtain a legal means of income, (2) maintain appropriate housing, and (3) cooperate with DCFS. Respondent failed to complete the domestic violence assessment, complete the substance abuse classes, missed numerous visits, and missed or tested positive for all randomized drug screens.

¶ 77　　　　　　Respondent argues on appeal that "the lack of reliable transportation was a critical

- 16 -

factor in her inability to attend and complete services." There was evidence that respondent had access to the "Help from Home" service. Although respondent argues that the fact that they needed "advance notification," which caused problems for her and ultimately resulted in her being dropped from parenting classes, the problem was with respondent's failure to plan, not with the transportation service failing her.

¶ 78	Additionally, respondent argues that she "didn't get a mental health evaluation or attend domestic violence classes in the first 9 month period; but there was ample testimony that she didn't understand the necessity for either ***." This is entirely unconvincing. Apparently, according to respondent, *any* failure to complete *any* service would be completely mitigated by the mere claim that the respondent did not understand why the service was necessary. We reject this argument.

¶ 79	The question before this court is to review whether "[t]he court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphasis in original.) *L.L.S.*, 218 Ill. App. 3d at 461. In relation to her mental health and domestic violence services, respondent was not close to fully complying with the directives.

¶ 80	Under these circumstances, we conclude that the trial court's finding was not against the manifest weight of the evidence.

¶ 81	B. The Best-Interests Determinations

¶ 82	1. *The Applicable Law and Standard of Review*

¶ 83	At the best-interests stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's

best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953; see also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 84    A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in the superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 85                                    2. *This Case*

¶ 86    The trial court noted that the minors' current placements contributed to the development of their identities through their friends at camp and church "who share their same

- 18 -

culture." The court noted that the minors' attachment to respondent was lacking due to the missed visits and emphasized how the minors had articulated their future plans, which included their foster parents. The court also described the harmful impact the missed visits had on the children and how it risked making the children feel unimportant. The court stated that the missed visits were very impactful in relation to the minors' need for permanency and that the minors needed to be with people who were "going to be there for them 100% of the time." The court concluded it was in the children's best interests to remove them from that environment and put them in one in which they would have permanency.

¶ 87        On appeal, respondent argues that the trial court disregarded or misapplied the following information: (1) there was evidence the foster parents had difficulty caring for the minors' hair and skin, (2) the foster parents were white and the minors are black, and (3) the six children are spread out among three foster placements. These facts were not disregarded. Indeed, the trial court explicitly mentioned all of these concerns, and they were clearly a part of the court's ultimate decision.

¶ 88        The question before this court is not whether another court could have come to a different conclusion regarding this information but instead whether this trial court's decision was against the manifest weight of the evidence. The court weighed the above issues and concluded that they were either mitigated or outweighed by other evidence. Although there was evidence both for and against the proposition that it was in the minors' best interests that the parental rights be terminated, we conclude that the trial court's decision was not against the manifest weight of the evidence.

¶ 89                              III. CONCLUSION

¶ 90        For the reasons stated, we affirm the trial court's judgments.

- 19 -

¶ 91   Affirmed.