# Illinois Official Reports

## Appellate Court

---

### *In re K.P.*, 2020 IL App (3d) 190709

---

| | |
|---|---|
| Appellate Court Caption | *In re* K.P., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Alexander P., Respondent-Appellant). |
| District & No. | Third District<br>No. 3-19-0709 |
| Filed | May 4, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 17-JA-177; the Hon. David A. Brown, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Derek A. Schroen, of Peoria, for appellant.<br><br>Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices McDade and Schmidt concurred in the judgment and opinion. |

**OPINION**

¶ 1    The respondent, Alexander P., appeals from the circuit court's order terminating his parental rights as to his son, K.P. On appeal, respondent argues the trial court's findings that he was unfit and that it was in the best interest of K.P. to terminate his parental rights were against the manifest weight of the evidence. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    K.P. was born in June 2016. On July 12, 2017, the State filed a petition for adjudication of wardship, alleging that K.P. was neglected in that K.P.'s environment was injurious to K.P.'s welfare because: (a) on June 26, 2017, respondent left (then one-year-old) K.P. alone in a car in a Walmart parking lot for approximately 20 minutes, with the doors to the vehicle unlocked and the car running; (b) on the night of June 26, 2017, K.P.'s mother and respondent were involved in an altercation at respondent's home, with respondent reporting that K.P.'s mother had attacked him and K.P.'s mother reporting that respondent had attacked her, and police observing that respondent was injured and intoxicated; (c) on May 23, 2017, respondent drove a vehicle under the influence of drugs, rear-ended two vehicles, left the scene of the accident, was subsequently arrested by police, and admitted to using cannabis a few weeks prior and taking Xanax; (d) on March 8, 2017, respondent was driving with the minor in the vehicle, was pulled over by police for speeding, and was found to be in possession of cannabis and two cannabis dabs, a pipe, a "hitter box," and a clonazepam pill; (e) respondent reported that K.P.'s mother had a substance abuse problem, and on May 14, 2017, police went to her home on a disturbance call (between K.P.'s mother and her former paramour), there was a strong odor of cannabis in the home, and K.P.'s mother failed to perform requested drug drops on June 27, 2017, June 28, 2017, and July 6, 2017; (f) respondent had a substance abuse problem; and (g) respondent had a 2014 driving under the influence (DUI) conviction and a pending 2017 DUI charge. Respondent stipulated that the State would call witnesses who would support the allegations in the petition (except the allegations regarding the pill because the pill was a prescribed Alprazolam pill).

¶ 4    On September 21, 2017, an adjudication hearing took place. The trial court found that K.P. was neglected based on unresolved substance abuse and domestic violence issues.

¶ 5    On October 19, 2017, the trial court entered a dispositional order, indicating that it found respondent unfit to care for K.P. and naming the Department of Children and Family Services (DCFS) as K.P.'s guardian. The trial court ordered respondent to complete a psychological evaluation within 10 days and also ordered him to (1) execute all authorizations for releases of information requested by DCFS; (2) cooperate fully and completely with DCFS; (3) obtain a drug and alcohol assessment, cooperate with and successfully complete any course of treatment recommended, and provide proof to DCFS of successful completion of the treatment; (4) perform random drug drops two times per month; (5) submit to a psychological examination arranged by DCFS and follow the recommendations made; (6) participate and successfully complete counseling and provide DCFS with proof of successful completion of the counseling; (7) participate and successfully complete a domestic violence course or classes specified by DCFS and provide DCFS proof of successful completion of such domestic violence course or classes; (8) provide to the assigned caseworker any change in address and/or phone number and any change in the members of the household within three days; (9) provide

to the assigned caseworker the name, date of birth, social security number, and relationship of any individual requested by DCFS or designee with whom DCFS has reason to believe that a relationship exists or has developed that will affect K.P.; and (10) visit as scheduled with K.P. at the times and places set by DCFS and demonstrate appropriate parenting conduct during visits.

¶ 6 On January 28, 2019, the State filed a petition to terminate respondent's parental rights. The petition alleged respondent was unfit for failing to make reasonable progress toward the return of K.P. during any nine-month period following the adjudication of neglect, pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)), with the nine-month period being February 1, 2018, to November 1, 2018.

¶ 7 On June 13, 2019, at the unfitness hearing, the parties entered an agreed stipulation indicating that respondent's father would testify that during the relevant nine-month period (between February 2018 and November 2018) respondent was not employed, respondent stayed in approximately six different hotels (paid for by respondent's parents) until respondent went into a rehabilitation facility in September 2018, and respondent stayed in the rehabilitation facility from September until mid-October 2018 and then moved in with his parents.

¶ 8 Tyrease Taylor testified that he had been the caseworker in this case from July 12, 2017, until March 15, 2019. Pursuant to the dispositional order entered on October 19, 2017, Taylor referred respondent for services, including a drug and alcohol assessment, drug drops, a psychological evaluation, individual counseling, domestic violence counseling, and visitation with K.P. Respondent was referred for a drug and alcohol assessment in August 2017. Although respondent was referred for a psychological evaluation on November 2, 2017, a second referral was needed after respondent failed to complete the first evaluation. Respondent was initially referred to domestic violence counseling on September 9, 2017, but was terminated for lack of attendance. Respondent completed a substance abuse assessment and completed substance abuse treatment (attending treatment from September 6, 2018, to October 3, 2018). For the most part, during visits, respondent was attentive to K.P.

¶ 9 Taylor testified that respondent was to complete two drug drops at Help at Home each month. Taylor did not receive confirmation for 11 scheduled drug drops during the relevant nine-month period—drops scheduled on February 6, March 6, and March 21, 2018, plus six drug drops between May 4 to August 14, 2018, and drops on October 5 and October 16, 2018. When respondent was in rehabilitation (from September 6, 2018, to October 3, 2018), six out of eight of his drug drops were clean. Taylor also did not receive any confirmation that respondent had completed individual counseling or domestic violence counseling. During the relevant nine-month period, Taylor communicated with respondent frequently through e-mail, and met with him in person on February 21, 2018, once in May 2018, and on July 18, July 23, September 28, and October 3, 2018. At a permanency review hearing in November 2018, Taylor recommended that the permanency goal in this case be changed to substitute care pending termination of parental rights because respondent (and K.P.'s biological mother) were not engaged in services and had not made the necessary changes to provide a healthy and stable lifestyle for K.P.

¶ 10 Officer Rodgers of the Peoria Police Department testified that he was on duty at 2 a.m. on July 24, 2018, and was dispatched to the Red Roof Inn regarding an intoxicated male. When Rodgers arrived, respondent was knocking on a room door that was not his own and was asking

to be let inside. A female answered the door and said that respondent had been banging on the door for the last 20 minutes, they had just met respondent that evening, and respondent would not leave them alone. When Rodgers was escorting respondent to his own room, an employee approached them and indicated that respondent needed to leave. Once in the room, Rodgers asked for respondent's identification, but respondent refused. Respondent would not provide Rodgers with his name and would not pack up his stuff to leave. Respondent was eventually arrested for trespassing. Rodgers described respondent as having been intoxicated, slurring his words, and having trouble with his balance.

¶ 11        Officer Matthew West of the Peoria Police Department testified that on October 4th, 2018, at approximately 2 p.m., he was dispatched to the Super 8 motel regarding a heroin overdose. Upon his arrival, West saw that respondent was lying on the bed in a hotel room, unconscious. Personnel from the Peoria Fire Department were administering chest compressions to respondent. Respondent was given three doses of Narcan (to stop the synthetic opiate effect on the brain that caused the body to stop breathing). After the three doses of Narcan, respondent was revived. He was then transported to the hospital.

¶ 12        Officer Corey Miller testified that on October 4, 2018, at approximately 2 p.m., he also responded to the call regarding a possible heroin overdose at the Super 8 motel. Miller was directed to go to the OSF Saint Francis Medical Center emergency room, where he spoke with respondent. Respondent told Miller that he did not know the person from whom he obtained the heroin. Miller asked respondent if respondent believed that he had overused the heroin or if it was bad heroin. Respondent indicated he had taken bad heroin.

¶ 13        Respondent testified that as part of his court ordered services, he was required to do drug drops at Help at Home. He went to Help at Home on February 26, 2018, and attempted to perform a requested drug drop, but he was not in their system. Respondent contacted his caseworker, Tyrease Taylor, but his caseworker did not get back to him for several days. The same thing occurred on two additional occasions. He was able to complete his first drug drop in March 2018, but he could not recall whether it was a clean drop.

¶ 14        Respondent testified that he was "dropped" from individual counseling. He indicated that since February 2018 he had repeatedly called and e-mailed his caseworker to get back into counseling (at least twice per month) with no response back from his caseworker. He was not placed on the list to go back to counseling until August 2018.

¶ 15        In September 2018, respondent checked himself into a 28-day inpatient rehabilitation program, which he completed. The program included a parenting class. Respondent also attended a domestic violence program at the Center for Prevention of Abuse, but he was terminated from the program in June 2018, and it took months for him to get placed back on the waitlist. Respondent indicated that he had an e-mail indicating that it was through his caseworker's error that he was not placed back on the domestic violence program waitlist earlier.

¶ 16        Respondent began treatment for his depression in June 2018 and was prescribed medication, which he was still taking. During the nine-month period between February and November 2018, respondent reached out to his caseworker at least 100 times via phone calls, e-mails, and voicemails. In response, his caseworker contacted him approximately 10 times. Respondent testified that he only had one in-person meeting with his caseworker during the entirety of the nine-month period, which took place in July 2018.

¶ 17    On cross-examination, respondent agreed that although he missed three drug drops because he was not initially in the system at Help at Home, he was subsequently scheduled for many more drops, many of which he missed. Respondent agreed that he did not complete the domestic violence program, explaining at the time he was in the program his living situation and employment situation were unstable and he was "going through a lot of mental health issues." Respondent agreed that there was a child and family team meeting sometime in the week of October 4, 2018, which he missed because he had overdosed and was in the hospital.

¶ 18    Exhibits that were entered into evidence showed that respondent failed to appear for drug drops on March 6, March 21, April 24, May 4, May 16, June 8, and June 20, 2018, and he tested positive for benzodiazepines and cocaine metabolites on April 5, 2018. The records also indicated that respondent did not complete his psychological evaluation, with respondent failing to attend the second part on February 2, 2018. Records from FamilyCore indicated that respondent had not completed individual counseling, missing all meetings without notification except for one meeting in January 2018. An exhibit also indicated that respondent had been terminated from the domestic violence program on June 19, 2018, for being absent more than three times without contacting the office (with absences on March 5, May 21, June 4, June 11, and June 18, 2018). The exhibits also indicated that on September 6, 2018, respondent entered substance abuse treatment and was diagnosed with severe alcohol use disorder and severe cannabis use disorder. Respondent successfully completed the substance abuse treatment program on October 3, 2018. The following afternoon, at 2:40 p.m. on October 4, 2018, respondent was admitted to the emergency department of the St. Francis Medical Center after overdosing on heroin, and then he left the hospital against medical advice.

¶ 19    The trial court found that respondent was unfit for failing to make reasonable progress during the alleged nine-month period. The matter proceeded to a best interest hearing.

¶ 20    On October 17, 2019, at the best interest hearing, the trial court indicated it had "received" the caseworker's best interest report, and then the parties' introduced themselves for the record. Respondent's parents identified themselves as being present and indicated they had originally been K.P.'s foster parents. For the past year, K.P. had been living with his maternal grandparents. The caseworker indicated (without being sworn in to testify) that three-year-old K.P. called his maternal grandparents' home "home" and that K.P. "attended preschool, many different kinds of classes, learning classes."

¶ 21    Respondent testified that he had moved into his parents' home almost one year ago (presumably after his heroin overdose on October 4, 2018), and he had been sober for the past six months. To maintain his sobriety, respondent attended alcoholic anonymous meetings (AA meetings) and he communicated with his sponsor every day. Respondent completed an inpatient treatment program on September 5, 2019, and was attending outpatient classes once per week (anticipated to be completed in mid-December 2019). His drug drops submitted as part of that program had been clean (except for his prescription medications for anxiety, depression, and post-traumatic stress syndrome (PTSD)). Respondent also had been attending individual counseling sessions every other week since April 2019 and was going to be taking domestic violence classes.

¶ 22    Respondent testified that he had visitation with K.P. for one hour per month. At the beginning of each visit, K.P. ran to respondent and hugged him. K.P. called respondent "daddy" and told respondent that he loved him. Respondent and K.P. played with cars or with anything else K.P. wanted. When it was time to leave at the end of visits, K.P. would get upset

- 5 -

and ask about respondent's parents because K.P. knew that respondent lived with them. Respondent and K.P. still had a strong bond, and K.P. did not know anyone else as a father figure. For the first year of K.P.'s life, respondent raised K.P. by himself. Respondent did not feel that it would be appropriate for the trial court to terminate his parental rights since he had overcome a lot in relation to his addiction and had learned so much. Respondent believed that it was not in the best interest of K.P. for K.P. to not have his father in his life when "he does [not] have his mother with us anymore."

¶ 23 On cross-examination, respondent indicated that he was not currently employed. He had recently been released from inpatient treatment and was looking for a job. If K.P. was returned to his care, he would be able to support K.P. because, for the time-being, respondent had a Link card from the state for food and they had a stable place to live with respondent's parents. Respondent testified that although he was not currently employed, if K.P. came to live with him, K.P. "would be well taken care of" and there would never be any financial problems that would prevent respondent from helping K.P.—respondent and his parents were going to give K.P. whatever he needed. Respondent testified that employment was coming "as soon as possible" and he had been "relentless" in his job search and his sobriety. Respondent was looking for any job right now, but in the future respondent intended to take the electricians examination. Respondent loved K.P. and loved spending time with K.P. When K.P. was originally removed from respondent's care in 2017, respondent "fell into a really deep depression," made a lot of mistakes, and had a hard time functioning day-to-day. In June 2018, respondent's doctor started him on a depression medication, but it took them several months of working together to find the correct dosage.

¶ 24 In 2017, respondent was involved with criminal cases regarding endangering the health and life of a child, reckless driving, and unlawful possession of drug paraphernalia. Respondent was placed on conditional discharge in the beginning of 2018, and in the beginning of 2019, respondent admitted to violating his conditional discharge. Until six months ago, respondent had been "self-medicating," but he felt his prescription medications "got balanced out in about March" 2019, and he has been sober since.

¶ 25 The trial court took judicial notice of respondent's sentencing order from February 13, 2018, indicating respondent was placed on conditional discharge for 2017 charges of endangering the life and health of a child, reckless driving, and unlawful possession of drug paraphernalia. The trial court also took judicial notice of respondent's admission entered on January 17, 2019, that he violated the conditional discharge. The State also offered into evidence police reports pertaining to incidents of respondent overdosing on heroin (and being revived by police) on November 30, 2017, and police being called on August 30, 2018, for possible domestic violence between respondent and his father at the motel respondent was residing after respondents' parents informed respondent they were no longer paying for his hotel room and offered to bring him home. The attorney for the State indicated it was offering no additional evidence "besides the evidence offered at the *** unfitness hearing."

¶ 26 In closing arguments, the attorney for the State argued that it was in K.P.'s best interest for the trial court to terminate respondent's parental rights, noting K.P.'s need for permanence where K.P. had been in foster care for 825 days. The attorney for the State also argued that three-year-old K.P. only knew of his current placement as his home, which indicated that was where K.P. desired to live. The attorney for the State additionally argued that respondent's demonstrated lack of judgment should not be underestimated when deciding whether

respondent would be able to provide a predictable, stable, and reasonably nurturing environment for K.P.

¶ 27    Respondent's attorney argued that it was not in K.P.'s best interest to terminate respondent's parental rights. Respondent's attorney contended that it was clear from respondent's testimony that respondent and K.P. still had "a very strong bond."

¶ 28    The guardian *ad litem* indicated that her recommendation was for respondent's parental rights to be terminated. She stated:

"Poor [K.P.] has been in care for 825 days. He requires permanency. He's a very young child. He seems to have found that permanency in his current placement. *** [A]t this young stage of [K.P.]'s life he needs permanency and he's comfortable and happy and doing well where he is.

I applaud [respondent] for his sobriety and efforts at getting a handle on his life, but I just think at this—at this young stage of [K.P.]'s life he needs permanency and he's comfortable and happy and doing well where he is."

¶ 29    In announcing its ruling, the trial court announced that it had considered the best interest report filed by the current caseworker, with no objection from respondent. (Respondent also raises no issue on appeal regarding the trial court's consideration of the best interest report.) The best interest report indicated that while respondent had been present for visits with K.P., he did not interact with K.P. in a parenting capacity. The caseworker detailed the services that respondent was supposed to have completed in this case and noted the respondent had failed to complete those services in order to "regain his fitness." The caseworker indicated in the report that K.P.'s current foster placement was willing to provide permanency for K.P. and that K.P. and his caregivers were bonded to each other. She also noted in the report that K.P. looked to them for safety and support and they were meeting K.P.'s basic needs of food, shelter, health, and clothing. She further indicated in the report that K.P.'s medical needs were being met by his current caregivers, no concerns were noted by K.P.'s pediatrician, and K.P. was attending daycare. The caseworker noted in the report K.P. had a positive relationship with respondent and referred to respondent as "dad." The caseworker indicated in the report that K.P. and respondent played "as friends" during the visits but most times K.P. asked to be taken home before the visit was over. She also indicated in the report that K.P. had "shown significant growth" since residing in his current placement with his maternal grandparents, referred to them as "granny" and "papa," and had found comfort and stability in his placement with them. The caseworker further noted in the report that she believed it was in the best interest of K.P. for respondent's parental rights to be terminated, noting K.P. needed permanency as he has been in care for 825 days.

¶ 30    The trial court acknowledged respondent's testimony that he had been sober for six months but noted that, in January or February 2019, respondent had admitted to violating his conditional discharge, was sentenced to 120 days in jail, went into treatment upon his release from jail, and was released from treatment on September 5, 2019. The trial court concluded that respondent's "sobriety has been a month outside of a controlled environment." The trial court reviewed the statutory best interest factors and stated the "heroes in this case [were] the grandparents that have been there to make sure that [K.P.] has been taken care of." The trial court noted that K.P. called his present placement "home." The trial court indicated, "the grandparents have been the support networks for the child throughout the case" and "provided the backstop for K.P. for two-thirds of his life, and dad has [not]." The trial court found that

the State proved by a preponderance of the evidence that it was in the best interest of K.P. to terminate respondent's parental rights.

¶ 31    Respondent appealed.

¶ 32                                II. ANALYSIS
¶ 33                            A. Unfitness Finding
¶ 34    On appeal, respondent argues the trial court's finding of his unfitness was against the manifest weight of the evidence. The State argues that it had proven respondent's unfitness by clear and convincing evidence and the trial court's finding that respondent was unfit was not against the manifest weight of the evidence.

¶ 35    In Illinois, the power to involuntarily terminate parental rights is statutorily derived from the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018)) and the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). *In re E.B.*, 231 Ill. 2d 459, 463 (2008). The involuntary termination of parental rights is a two-step process. 705 ILCS 405/2-29(2) (West 2018); *In re C.W.*, 199 Ill. 2d 198, 210 (2002). Initially, the court must find that a parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *E.B.*, 231 Ill. 2d at 472. Section 1(D) lists several grounds upon which a finding of unfitness can be made. 750 ILCS 50/1(D) (West 2018). If the court makes a finding of parental unfitness under section 1(D) of the Adoption Act, the court then considers the best interests of the child in determining whether parental rights should be terminated. 705 ILCS 405/2-29(2) (West 2018); *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010).

¶ 36    Here, the trial court found that respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act because he failed to make reasonable progress toward the return home of K.P. during any nine-month period following the adjudication of neglect, with the nine-month period being February 1, 2018, through November 1, 2018. Reasonable progress is examined under an objective standard measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). Reasonable progress exists when the trial court can conclude that the progress being made by a parent to comply with directives is sufficiently demonstrable and of such a quality that the trial court will be able to order the minor returned to parental custody in the near future. *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22; *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). The "[f]ailure *** to make reasonable progress toward the return of the child to the parent" includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care if a service plan was established and services were available. 750 ILCS 50/1(D)(m)(ii) (West 2018); see also *C.N.*, 196 Ill. 2d at 217.

¶ 37    The State must prove parental unfitness by clear and convincing evidence. 705 ILCS 405/2-29(4) (West 2018); 750 ILCS 50/1(D) (West 2018); *C.N.*, 196 Ill. 2d at 208. A trial court's finding of parental unfitness will not be reversed on appeal unless it is against the manifest weight of the evidence. *C.N.*, 196 Ill. 2d at 208. Only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion will the trial court's decision

be deemed to have been against the manifest weight of the evidence. *Id.*; *In re Tiffany M.*, 353 Ill. App. 3d 883, 890 (2004).

¶ 38    In reviewing the record in this case, we cannot say the trial court's finding of parental unfitness based upon the respondent's failure to make reasonable progress toward the return of K.P. during the alleged nine-month period was against the manifest weight of the evidence. The evidence showed that respondent failed to substantially fulfill his obligations under the service plan. Specifically, respondent failed to complete a psychological examination, individual counseling, and a domestic violence program. Respondent also failed to complete any clean drug drops prior to entering treatment in September 2018. He was involved in an incident wherein he was intoxicated to the point of requiring police involvement on July 24, 2018. Although respondent completed a 28-day substance abuse program toward the end of the nine-month period, the treatment was not successful as was evidenced by respondent overdosing on heroin the day after being discharged from the program. During the nine-month period, respondent also remained unemployed and resided in motels or hotels paid for by his parents. Therefore, the trial court's finding that respondent failed to make reasonable progress during the specified nine-month period was not against the manifest weight of the evidence.

¶ 39                                   B. Best Interest Finding

¶ 40    Respondent also contends on appeal that the trial court's determination that it was in the best interest of K.P. to terminate his parental rights was against the manifest weight of the evidence. The respondent argues that the trial court placed too much weight on his prior drug addiction and did not give enough weight to his recovery and sobriety. He further contends that the trial court failed to give sufficient consideration to K.P.'s family ties and his bond with respondent. In response to respondent's argument, the State submits that the trial court's finding that it was in the best interest of K.P. to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 41    At the best interest stage, the State bears the burden of proving by a preponderance of the evidence that the termination of parental rights is in the child's best interests. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). The preponderance of the evidence standard is a less stringent standard than proof beyond a reasonable doubt and even less stringent than the intermediate standard of clear and convincing evidence. *People v. Peterson*, 2017 IL 120331, ¶ 37. Under the preponderance of the evidence standard, the State needs only to present evidence that renders the fact at issue more likely than not. *Id.*

¶ 42    In making a best interest determination, the trial court shall consider, within the context of the child's age and developmental needs, the following factors: (1) the physical safety and welfare of the child (including food, shelter, health, and clothing); (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including where the child feels love, attachment, and a sense of being valued, the child's sense of security and familiarity, continuity of affection for the child, and the least disruptive placement alternative for the child; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other figures; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 43 An appellate court will not reverse a trial court's best interest determination unless it is against the manifest weight of the evidence. *In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005), *abrogated on other grounds by In re M.M.*, 2016 IL 119932, ¶ 28; *Tiffany M.*, 353 Ill. App. 3d at 890-92. A best interest determination is against the manifest weight of the evidence if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or that the conclusion itself is unreasonable, arbitrary, or not based on the evidence presented. *Tiffany M.*, 353 Ill. App. 3d at 890.

¶ 44 In this case, we note that the bulk of the evidence presented at the best interest hearing pertained to respondent's fitness rather than to K.P. and his current placement. See *D.T.*, 212 Ill. 2d at 364 (once a parent is found unfit, the focus shifts to the child, and the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life). While the attorney for the State argued that in K.P.'s current placement, all of K.P.'s physical, safety, and welfare needs, including food, shelter, health, and clothing, were being met and K.P. had "shown significant growth" since residing with his current caregivers, no evidence was presented at the best interest hearing in that regard. Neither the caseworker nor K.P.'s caregivers testified at the best interest hearing. However, the best interest report was in the court file and was considered by the trial court without objection.

¶ 45 Therefore, it is apparent from the record that the trial court considered the best interest report and the report was given its natural probative effect. See *In re Jaber W.*, 344 Ill. App. 3d 250, 256 (2003) (an objection not offered in the trial court is waived); *People v. Akis*, 63 Ill. 2d 296, 299 (1976) (when hearsay evidence admitted without objection it is to be considered and given its natural probative effect). In the best interest report, the caseworker indicated that K.P. was bonded to his current caregivers (his maternal grandparents), he looked to them for safety and support, and they met his basic needs of food, shelter, health, and clothing, in addition to meeting his medical needs (with no medical concerns indicated). The caseworker also indicated in the best interest report that K.P. had found comfort and stability in his placement with them. Additionally, the evidence was clear regarding K.P.'s need for permanency. K.P. was three years old at the time of the permanency review hearing and had been in foster care for approximately 825 days, more than two-thirds of his life. In reviewing the statutory factors within the context of K.P.'s age and developmental needs, we cannot say that the facts clearly demonstrate that the trial court should have reached the opposite result in this case. See *Austin W.*, 214 Ill. 2d at 51-52; *Tiffany M.*, 353 Ill. App. 3d at 890-92.

¶ 46 We, therefore, conclude that the trial court's finding that it was in K.P.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 47                                    III. CONCLUSION
¶ 48 The judgment of the circuit court of Peoria County is affirmed.

¶ 49 Affirmed.