NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210369-U

NO. 4-21-0369

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 12, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Jersey County |
| Petitioner-Appellee, | ) | No. 17JA43 |
| v. | ) | |
| Shane C., | ) | Honorable |
| Respondent-Appellant). | ) | Allison Lorton, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1  *Held:*   The appellate court affirmed the trial court's judgment terminating respondent's
parental rights because the trial court's fitness determination was not against the
manifest weight of the evidence.

¶ 2       Respondent, Shane C., is the father of B.C. (born December 2017). In May 2021,

the trial court found respondent was an unfit parent under the Adoption Act, and in June 2021, it

found termination of respondent's parental rights would be in the minor child's best interests.

Respondent appeals, arguing that the trial court's fitness determination was (1) based upon an

improper standard and (2) against the manifest weight of the evidence. We disagree and affirm.

¶ 3                          I. BACKGROUND

¶ 4                        A. Procedural History

¶ 5       In December 2017, the State filed a petition for adjudication of wardship, alleging

B.C. was neglected due to his being a minor whose environment was injurious to his welfare in

that his mother tested positive for opiates the day of his birth and she admitted to using heroin and methamphetamine during the pregnancy. See 705 ILCS 405/2-3(1)(c) (West 2016). That same day, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS). In January 2018, the trial court adjudicated B.C. a neglected minor.

¶ 6 In February 2018, the trial court conducted a dispositional hearing at which it entered a written order making B.C. a ward of the court based upon its finding respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor. The court also concluded it would be contrary to B.C.'s health, safety, and best interest to be in respondent's custody. The court then placed guardianship and custody of B.C. with the guardianship administrator of DCFS. The written order also stated, "The parents are admonished that they must cooperate with the Illinois Department of Children and Family Services. The parents must comply with the terms of the service plan and correct the conditions that require the minor to be in care or they risk termination of their parental rights."

¶ 7 B. The Termination Proceedings

¶ 8 In October 2020, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent because he failed to (1) make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent within nine months after the adjudication of neglect and (2) make reasonable progress toward the return of the child within the nine-month periods of October 2018 to July 2019 and July 2019 to April 2020. See 750 ILCS 50/1(D)(m)(i)-(ii) (West 2018).

¶ 9 1. *The Fitness Proceedings*

¶ 10          In May 2021, the trial court conducted a hearing on the parental fitness portion of the termination proceedings.

¶ 11          Carrie Carpenter testified she was a caseworker with DCFS and had been assigned to the case since its inception in December 2017. Carpenter agreed that between January and October 2018, respondent made satisfactory progress. However, respondent rated unsatisfactory for the periods between (1) October 2018 and July 2019 and (2) July 2019 to April 2020. During those periods, respondent was not engaged in services, was not participating in substance abuse treatment and testing, and was not "fully engaged in parenting *** services." Carpenter said respondent never completed parenting services.

¶ 12          Regarding visitation, Carpenter stated respondent had last seen B.C. in person in December 2019. Prior to that date, he was offered weekly visits. Carpenter testified that at one point respondent had visits twice per week but they were reduced to once per week because of his failure to appear.

¶ 13          Regarding drug testing, Carpenter testified DCFS requested defendant submit to testing a total of 34 times but respondent only appeared for 6. Of those six, respondent tested negative three times, and the remaining three "were considered adulterated, which means that he either had too much water before or there wasn't enough—the creatinine levels were off so they consider those adulterated." Carpenter acknowledged that respondent had been "compliant with parole for a portion of that time" and he completed substance abuse services during "that initial time frame" but "circumstances changed and he was re-referred and never completed the referral."

¶ 14          Carpenter further testified respondent had been in prison since August 2020 and had a release date of July 2024.

¶ 15        On cross-examination, Carpenter explained respondent was in prison when the case was opened until his release in August 2018. Between August 2018 and April 2019, respondent did "relatively well. He was compliant with parole. He was going to his [drug] drops through TAS[C] through parole. And then January, February of '19 happened and that's when his three adulterated drug drops came in so he was re-referred for treatment." Respondent did not participate in drug treatment or testing since that time.

¶ 16        Carpenter further explained respondent had been in and out of both county jail and prison. Respondent was "out" most of 2019. In January 2020, respondent was arrested in Jersey County and briefly spent time in prison before being released "because of Covid reasons." Respondent was then arrested on new charges in Jersey County and was sent to prison in August 2020. Carpenter stated the Illinois Department of Corrections (IDOC) typically provided services but those services had been restricted or shut down during the COVID-19 pandemic.

¶ 17        Respondent testified he was currently in prison and had been in prison when the case was opened. He agreed to a DNA test, which established his paternity about six months after B.C. was born. Respondent then began visitations with B.C., which at first took place with respondent at IDOC. After his release, respondent attended supervised visits at DCFS. Eventually, the visits moved to respondent's parents' house and were conducted twice a week.

¶ 18        When respondent was in prison, he continued to maintain contact with B.C. through various means of communication. Respondent wrote B.C. letters, drew him pictures, spoke with him on the phone, and sent B.C. CDs that contained recordings of respondent reading children's books. Respondent explained he sent the letters so his mom could read them to B.C. and, even though B.C. was too young to read, B.C. would be able to look back and know how much respondent loved and cared about him.

¶ 19        Respondent testified he was unable to make it to scheduled drug tests because of his work schedule. Respondent did not have a driver's license, and DCFS scheduled the tests with too little notice for him to consistently attend. Respondent further explained he worked in a remote location far away from the testing sites and his employer threatened to fire him if he missed work for any reason. Respondent stated he tried to coordinate between his employer and DCFS to get his visits and drug tests rescheduled to nights and weekends but ended up losing his job anyway.

¶ 20        Respondent testified he was serving time in prison for convictions of possession of methamphetamine, theft, and possession of burglary tools. When IDOC offered parenting classes and other services during his incarceration in 2018, respondent attended them to the satisfaction of DCFS. However, IDOC did not offer any such services during the pandemic and had only recently begun offering limited parenting classes. Respondent was on a waiting list. Respondent stated he had done six virtual visits with B.C. since his return to prison and spoke on the phone with B.C. every Sunday.

¶ 21        Patricia C. testified she was respondent's mother and B.C.'s grandmother. Patricia described how respondent interacted with B.C. during visits and on the phone. She further described reading B.C. respondent's letters and playing respondent's book recordings. Patricia acknowledged that respondent had difficulty attending some drug tests but explained that his then-wife would sometimes agree to drive him in advance and then refuse to do so when the time came.

¶ 22        The trial court took the matter under advisement. In May 2021, the court entered a written order in which it found the State proved the grounds for unfitness—failure to make reasonable efforts and failure to make reasonable progress—by clear and convincing evidence.

The court noted respondent made satisfactory progress between January and October 2018 but "beginning in approximately April 2019, [respondent's] compliance with his service plan and efforts toward reunification greatly decreased." The court explained the evidence showed respondent completed only six drug tests, three of which were adulterated, and "[a]s a result of [respondent's] drug use, he was re-referred to treatment which he never completed." The court concluded as follows:

> "[Respondent] was incarcerated for several months beginning in March of 2020 to approximately June of 2020, then thereafter sent to [IDOC] in July of 2020. [Respondent's] projected parole date is July of 2024. Contrary to the argument of [respondent's] counsel, [respondent's] failure to make reasonable efforts or comply with his service plans is not directly as a result of his incarceration, but rather his own conduct during the 2019 reporting periods, where [respondent] was not incarcerated, that establishes by clear and convincing evidence [respondent's] unfitness as it relates to the needs of this child. The court has no doubt that [respondent] loves his son, however, [respondent] has failed to make sufficient progress in relation to the needs of his son since April of 2019, and therefore, is found unfit."

¶ 23                    2. *The Best-Interest Proceedings*

¶ 24          In June 2021, the trial court conducted proceedings regarding whether it was in B.C.'s best interest to terminate respondent's parental rights. Carpenter testified B.C. had been in his maternal grandmother's care since birth and was "safe and stable." The grandmother was willing to provide permanency through adoption. The trial court concluded it was in B.C.'s best interest to terminate respondent's parental rights and be made available for adoption.

¶ 25        This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27        Respondent appeals, arguing that the trial court's fitness determination was (1) improperly based, in part, upon a best-interest standard and (2) against the manifest weight of the evidence. We disagree and affirm.

¶ 28                        A. The Fitness Determination

¶ 29        Respondent argues the trial court's findings that respondent failed to make reasonable efforts and reasonable progress were against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's finding that respondent failed to make reasonable progress within the applicable nine-month periods was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 30                                A. The Law

¶ 31                            1. *The Standard of Review*

¶ 32        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.* "Under the manifest-weight-of-the-evidence standard, a reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight

to be given to the evidence, or the inferences to be drawn." (Internal quotation marks omitted.) *In re Parentage of W.J.B.*, 2016 IL App (2d) 140361, ¶ 25, 68 N.E.3d 977.

¶ 33                                            2. *Reasonable Progress*

¶ 34        The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) by clear and convincing evidence. *N.G.*, 2018 IL 121939, ¶ 28. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2018). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36, 157 N.E.3d 493 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001)).

¶ 35        Likewise, this court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444,

461, 577 N.E.2d 1375, 1387 (1991).

See also *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 36                                    B. This Case

¶ 37        Respondent first argues the trial court applied a best-interest standard at the

fitness portion of the termination proceedings. In support of this contention, respondent points

out that (1) the guardian *ad litem* made arguments to the court regarding B.C.'s best interest and

(2) in its written order, the court found respondent "failed to make sufficient progress in relation

to the needs of his son."

¶ 38        The trial court did not apply an improper standard. In *In re Ta. T.*, 2021 IL App

(4th) 200658, ¶ 55, this court explained how a trial court evaluates reasonable progress and wrote

the following:

> "Ultimately, the trial court's ability to return the children to a parent's care
>
> in the near future is the lodestar of whether a parent has made reasonable
>
> progress. Although the court is focusing on the parent's conduct and whether the
>
> parent is 'unfit' as defined by the Adoption Act, the parent's progress is always
>
> measured against (1) the conditions that brought the child into care and (2) other
>
> conditions subsequently discovered that prevent the child from returning to the
>
> parent's custody."

¶ 39        In this case, the trial court appropriately referred to "the needs of this child" only

in the context of whether respondent had made reasonable progress such that the court could be

confident that B.C. could be safely returned home. "The point of requiring parents to attend

classes and engage in services *** is so parents *apply* what they learn in their lives, in the real

world, such that the court can be confident that the children will be safe in their care." (Emphasis

- 9 -

in original.) *Id.* ¶ 56. A service plan is always designed with each specific parent and each specific child in mind. The needs of each child are intertwined with a parent's progress toward reunification. The court considered respondent's progress "*in relation to* the needs of his son." (Emphasis added.) The trial court's doing so was entirely appropriate.

¶ 40     Next, respondent argues the trial court's finding that he failed to make reasonable progress was against the manifest weight of the evidence. Respondent asserts the court incorrectly equated his failure to appear for a drug test with his failing a drug test, which would indicate drug use. Respondent further contends the State failed to present any evidence that his alleged drug use interfered with his ability to take care of B.C. Respondent also notes that because services were not offered to him while he was in prison, he was denied the opportunity to make progress.

¶ 41     B.C. was taken into care because his mother admitted to using methamphetamine during her pregnancy. Respondent admitted at the parental-fitness portion of the termination proceedings that he was currently incarcerated for possession of methamphetamine. Respondent further admitted he had prior drug related convictions. Carpenter testified that respondent had been in and out of jail and prison during the pendency of the case. The record clearly demonstrates respondent had an issue with illegal drugs that was interfering with his ability to care for B.C.

¶ 42     Regarding respondent's missed drug tests, the trial court was in the best position to evaluate the evidence and draw reasonable inferences from that evidence. Nothing in the record suggests the court's conclusion that respondent's perpetual missing of drug tests was an indication that he was using drugs was against the manifest weight of the evidence. This is particularly so because respondent gave an innocent explanation for his failure to attend at the

termination proceedings, and the court rejected it. See *id.* ¶ 57 (explaining this court is "especially deferential" when a trial court hears conflicting testimony and agrees with one witness's version of events).

¶ 43 Finally, the trial court explicitly grounded its finding of unfitness in "[respondent's] own conduct during the 2019 reporting periods, where [respondent] was not incarcerated." The court explained respondent's compliance with the service plan "greatly decreased" after April 2019, which coincided with his missed drug tests and decrease in visits due to respondent's failure to attend. Respondent was required to re-engage in substance abuse services but failed to do so. Contrary to respondent's claims, IDOC's inability to provide services during the pandemic did not affect the trial court's analysis.

¶ 44 In closing, we acknowledge, as the State and trial court did, that respondent was making reasonable progress during the first nine-month period after B.C. was adjudicated a neglected minor. Respondent made the most of his time in prison during 2018, actively engaging in any available services and making every effort to communicate with B.C. to show his love and affection. These actions were commendable, and had respondent continued on this path when he was out of prison, the State may well have decided not to file a petition for termination. Unfortunately, respondent's progress halted and eventually regressed.

¶ 45 We conclude that the trial court's finding that respondent failed to make reasonable progress was not against the manifest weight of the evidence.

¶ 46                                    III. CONCLUSION

¶ 47 For the reasons stated, we affirm the trial court's judgment.

¶ 48 Affirmed.