**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210537-U

Order filed March 14, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* J.D., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| a Minor | ) | Peoria County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-21-0537 |
| | ) | Circuit No. 17-JA-161 |
| v. | ) | |
| | ) | |
| Jessie L.H., | ) | Honorable |
| | ) | Timothy J. Cusack, |
| Respondent-Appellant). | ) | Judge, Presiding. |

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justices Lytton and McDade concurred in the judgement.

**ORDER**

¶ 1    *Held*:  Trial court's finding that respondent mother was unfit was not against the manifest weight of the evidence where the evidence showed that the mother failed to make some measurable or demonstrable progress toward the return of the minor. The subsequent finding that it was in the minor's best interest to terminate the mother's parental rights was also not against the manifest weight of the evidence.

¶ 2 Respondent mother, Jessie L.H., appealed from trial court orders finding her unfit and terminating her parental rights to her son, J.D.

¶ 3 I. BACKGROUND

¶ 4 J.D. was born on November 24, 2014. A petition alleging that J.D. was a neglected minor was filed on June 20, 2017. The petition alleged that J.D. was a neglected minor pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a) (West 2018)) due to an injurious environment in that J.D.'s two-month old sibling had injuries that could not occur absent abuse and/or neglect, Jessie gave conflicting stories about the injuries, Jessie was involved in a domestic violence incident with J.D.'s father, and Jessie was not cooperative with the Department of Children and Family Services (DCFS).

¶ 5 J.D. was adjudicated neglected on January 31, 2018, and the matter proceeded to a dispositional hearing. Jessie was found to be unfit, and J.D. was made a ward of the court. Jessie was ordered to execute all releases of information requested by DCFS; cooperate fully with DCFS; submit to a psychological examination and follow any recommendations; participate in counseling; participate and successfully complete a parenting course and domestic violence course; obtain and maintain stable housing; provide the assigned caseworker with any change in address or telephone number or any change in the members of her household; provide the caseworker information regarding any individual with a relationship that affects the minor; and participate in supervised visits with J.D. J.D's father was identified as Jesse D., and he was also found to be unfit and DCFS was appointed the guardian of J.D.

¶ 6 The State filed a petition to terminate the parental rights of both of J.D.'s parents on September 14, 2020, the petition against J.D.'s father was later dismissed. With respect to Jessie, the petition alleged that Jessie was unfit for failing to make reasonable progress toward the return

2

of J.D. during the nine-month period of December 2, 2019, to September 2, 2020. The adjudicatory hearing was held on November 8, 2021. Cassandra Perchalski testified that, during the relevant nine-month time period, she was employed by Lutheran Social Services of Illinois (LSSI) and was the caseworker for J.D. Perchalski testified that Jessie made little progress during the relevant time period. Jessie was not going to counseling every week as ordered. Perchalski testified that, to the best of her knowledge, Jessie had not adequately addressed concerns of domestic violence during the relevant time period. Jessie was also inconsistent with her drug drops. Perchalski recalled that, during the relevant time period, Jessie missed 20 of the 29 required drug drops and 3 were positive for THC. Perchalski testified that Jessie often cancelled or did not attend visits with J.D., but Perchalski could not testify to the reasons. During the relevant time period, Jessie's visits with J.D. were changed from weekly visits to a one-hour visit each month. Perchalski testified that telephone visits were offered for part of the relevant time period due to the COVID pandemic, and Jessie made two telephone visits between April and June 2020. Jessie did visit with J.D. in July and August. Perchalski also testified that Jessie claimed to be employed during the relevant time period, but Jessie did not provide pay stubs to verify. Jessie was uncooperative with the agency, often calling Perchalski names and bickering on the telephone. Perchalski had been terminated from her employment with LSSI prior to the adjudicatory hearing. Perchalski testified that Jessie was not a viable return option for J.D. as of September 2, 2020, primarily because Jessie had been living with a registered felon in the spring of 2020, she was not completing her drug drops, she was not consistently visiting J.D., and she had not documented that she was employed.

¶ 7        Jessie testified that she was employed at Dick Blick until mid-September 2019, but she suffered a shoulder injury and she was not cleared to return to work until January 2020. At that point, Jessie applied for jobs but was not successful in obtaining employment. In April 2020, Jessie

3

moved to Springfield, Illinois, and began working at JBS, where she worked for approximately two months. Jessie testified that she fell and broke her wrist in September 2021, so she was not cleared to work as of the date of the adjudicatory hearing on November 8, 2021. Jessie was collecting unemployment and preparing for surgery in January 2022. Jessie testified that she had verified her employment prior to the relevant time period, but she acknowledged that she did not verify any employment during the relevant time period. Jessie testified that, as for housing, she had lived in her father's home from April 2019 until April 2020. In April 2020, Jessie moved to an apartment in Springfield. Jessie testified that her home at the time of the hearing was suitable for children. DCFS had not visited her home in Springfield because of COVID. Jessie testified that she was attending counseling once a week during the relevant time period, although she did miss some counseling sessions, and Jessie felt that she was learning something from counseling. A printed list of Jessie's counseling appointments was admitted as an exhibit. The list had a number of status abbreviations that neither Jessie nor her counsel could define, but they agreed with the court that "N/S" meant "no show." When asked why she missed drug drops, Jessie testified that she was completing her drug drops after they were restarted following the COVID shutdown. Jessie testified that she tested positive for COVID at the end of July 2020, and she was very ill. When she recovered, Jessie testified that she was then not on the list for the drug drops.

¶ 8        Jessie testified that her visits with J.D. were good, and she felt a bond with J.D. She recalled one telephone visit cut short because J.D. was too distracted. Jessie only recalled cutting one other visit short, when the visits were longer, because she was sick. Jessie also acknowledged missing a telephone visit in June 2020. Jessie acknowledged cancelling some visits during the relevant timeframe, due to oversleeping from a late work schedule. Jessie had requested a different day or time for the visits, but that request was refused. When asked why she did not come to visits between

4

December 2, 2019, through February 8, 2020, Jessie testified that she believed she had visits with J.D., but she was also denied visits and the visits were cut from three hours down to one hour.

¶ 9    The trial court found that the State proved by clear and convincing evidence, during the time period from December 2, 2019, to September 2, 2020, that Jessie failed to make reasonable progress toward the return of J.D. The trial court noted that J.D. had already been in foster care for 2½ years before the petition to terminate was filed. Missing the drug drops showed a lack of interest in having J.D. returned to the home. The trial court also found that it was unlikely that Jessie had completed domestic violence counseling when Jessie's counseling record showed she only attended about half of her counseling sessions.

¶ 10    The matter proceeded to the best interest hearing, and all parties had a copy of the best interest report. Diana Bledsoe, the current caseworker, testified that J.D. was placed in a licensed foster home, with his younger sibling, where J.D. had resided since January 2020. The foster home provided J.D. with food, clothing, and shelter. Bledsoe testified that the foster mother provided for J.D.'s educational and mental development, medical needs, and his emotional needs. Bledsoe testified that J.D. knew Jessie and liked to visit with her. The best interest report dated June 24, 2021, indicates that J.D. was bonded to both foster parents, and they were willing to adopt him, but the goal for J.D. was to return to his father within 12 months. The report indicates that DCFS was given the discretion to begin returning J.D. to his father's home. It also indicates that J.D. did not have a close relationship with Jessie. Jessie testified that she had a good bond with J.D. and that J.D. was angry because he could not see Jessie more often. According to Jessie, J.D. asked if he could come home with her. Jessie testified that J.D. loved Jessie's father, mother, and brother. Jessie testified that she lived in Springfield, and the home was appropriate for J.D. Jessie testified

that it was not in J.D.'s best interest to terminate her parental rights because he needed her as much as she needed him.

¶ 11    The trial court found that it was in J.D.'s best interest to terminate Jessie's parental rights. The statutory factors all favored termination, with the need for permanency being one of the most critical factors. Jessie appealed, challenging the unfitness finding and the termination of her parental rights.

¶ 12                                II. ANALYSIS

¶ 13    Jessie argues that the trial court's finding that she was unfit, and its subsequent finding that the termination of Jessie's parental rights was in the J.D.'s best interest, were against the manifest weight of the evidence. The State argues that both rulings were not against the manifest weight of the evidence.

¶ 14    Section 2-29 of the Act sets forth a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). The first step is for the court to find, by clear and convincing evidence, that a parent is an unfit person as defined in section 1(D) of the Adoption Act. *In re M.I.*, 2016 IL 120232, ¶ 20. Section 1(D) of the Adoption Act defines an unfit person as "any person whom the court shall find to be unfit to have a child." 750 ILCS 50/1(D) (West 2018). The statute defines a number of grounds of unfitness, including the failure by a parent to make reasonable progress toward the return of the child during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(ii)). If the parent is found unfit, the second step in the process is to consider the best interest of the child. *M.I.*, 2016 IL 120232, ¶ 20. On appeal, we will only reverse the trial court's finding of unfitness if the finding was against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29.

6

¶ 15    The State alleged that Jessie was unfit because she failed to make reasonable progress toward the return home of J.D. during the period between December 2, 2019, and September 2, 2020. Jessie contends that she made reasonable progress during the relevant time period. Reasonable progress is measured by an objective standard based upon the amount of progress toward the return of the child, requiring consideration of "the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). Reasonable progress is progress toward the goal of returning the child to the parent so, at a minimum, it requires some measurable or demonstrable movement in that direction. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 57.

¶ 16    Jessie argues that the State did not prove that she failed to make reasonable progress toward the return of J.D. during the relevant time period. The State did not ask the trial court to take judicial notice of any files or reports; the testimony was limited to that of Perchalski and Jessie and the counseling record offered by Jessie. Jessie contends that this evidence was not sufficient to prove Jessie's lack of reasonable progress. Jessie also contends that the trial court erred in not allowing testimony and/or evidence as to why Perchalski's employment with LSSI was terminated. The State contends that the trial court properly excluded the testimony as irrelevant.

¶ 17    The admissibility of evidence is within the sound discretion of the trial court, and a reviewing court will not disturb evidentiary determinations absent a clear abuse of discretion. *In re A.S.*, 2014 IL App (3d) 140060, ¶ 28. We find no abuse of discretion in excluding testimony regarding Perchalski's employment status after the timeframe relevant to this case. If Perchalski's termination was in any way relevant to her handling of her duties as J.D.'s caseworker, Jessie's

7

failure to make an offer of proof to that effect precludes any review by this court. See *In re Marriage of Velasquez*, 295 Ill. App. 3d 350, 356 (1998) (an offer of proof is key to preserving the record so that a reviewing court can determine whether the exclusion of evidence was erroneous and harmful.). In addition, the trial court was entitled to take judicial notice of its prior orders on file in the case, and we may also take judicial notice of the trial court file. *In re Estate of McDonald*, 2021 IL App (2d) 191113, ¶ 72.

¶ 18        In this case, J.D. came into care when he was 2½ years old because his infant sibling had non-accidental injuries and Jessie denied any knowledge of how the injuries occurred. There were also allegations of domestic violence and a later permanency review order gave DCFS discretion to require Jessie to complete drug drops. According to Perchalski and the court record, Jessie was ordered to complete a number of tasks, including weekly counseling, weekly drug drops, weekly and then monthly visits with J.D., and cooperate with DCFS. Perchalski testified that, during the relevant timeframe, Jessie missed more counseling sessions than she attended; Jessie only completed 20 of 29 drug drops, and 3 of those were positive for THC; Jessie often cancelled or did not attend visits with J.D., including several missed telephone calls; Jessie did not verify her employment; and Jessie continued to be uncooperative with the agency. Jessie acknowledged that she had not verified any employment she had during the relevant timeframe and that she only attended approximately half of her counseling sessions. Jessie disagreed that she missed drug drops, other than the time period for the COVID shutdown and after she became ill with COVID in July 2020. Jessie acknowledged cancelling some visits with J.D., including a telephone visit in June 2020 and another shortened telephone visit, but claimed that the visits she attended went well.

¶ 19        The trial court found that Jessie failed to make reasonable progress toward the return of J.D. from December 2, 2019, to September 2, 2020. During that period, which began 2½ years

8

after J.D. was placed into foster care, Jessie was completing some court-ordered tasks, but she was not successfully completing other tasks, such as weekly counseling to address domestic violence concerns, weekly drug drops, consistent visits with J.D., and cooperation with the agency. Based on the evidence presented, the trial court's determination that Jessie failed to make some measurable or demonstrable progress toward the return of J.D. during the relevant nine-month period was not against the manifest weight of the evidence.

¶ 20   Jessie also contends that the trial court's finding that it was in J.D.'s best interest to terminate her parental rights was against the manifest weight of the evidence. Jessie argues that since the goal for J.D. was to return home to his father, and not adoption, it was not in J.D.'s best interest to terminate Jessie's parental rights. Jessie contends that it was against public policy to terminate her parental rights and deprive J.D. of the support of two parents. Jessie does not address any of the other best interest factors. The State submits that the trial court's finding that it was in the best interest of J.D. to terminate Jessie's parental rights was not against the manifest weight of the evidence.

¶ 21   Once a parent has been found unfit, the focus shifts to the child and the question of whether, "in light of the child's needs, parental rights *should* be terminated." (Emphasis in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The standard of proof required at a best interest hearing is a preponderance of the evidence. *Id.* at 366. When making a best interest determination, the trial court shall consider, within the context of the child's age and developmental needs, the following factors: (1) the physical safety and welfare of the child (including food, shelter, health, and clothing); (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks

9

related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). On review, we will not reverse a trial court's best interest determination unless it is against the manifest weight of the evidence. *In re K.P.*, 2020 IL App (3d) 190709, ¶ 43.

¶ 22 At the best interest hearing, the caseworker indicated that J.D. knew his mother, but he was bonded to his foster parents and to his father, and they met his basic needs of food, shelter, health, and clothing, in addition to meeting his medical needs. The best interest report indicated that J.D., who was almost seven years old, had been in foster care for more than four years. The foster parents were willing to provide permanency through adoption, but J.D. also had a good bond with his father and the plan was to return J.D. to his father's care. The father's retention of his parental rights did not preclude a finding that it was in J.D.'s best interest to terminate Jessie's parental rights. See *In re S.J.*, 233 Ill. App. 3d 88, 122 (1992) ("A court may terminate the parental rights of one parent while preserving those of the other parent."). In reviewing the statutory factors, in the context of J.D.'s age and need for permanency, we cannot say that the facts clearly demonstrate that the trial court's conclusion was against the manifest weight of the evidence.

¶ 23                                          CONCLUSION

¶ 24 The judgment of the circuit court of Peoria County is affirmed.

¶ 25 Affirmed.