NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220427-U

NO. 4-22-0427

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 14, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 19JA89 |
| v. | ) | |
| Sharon S., | ) | Honorable |
| | ) | Dwayne A. Gab, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed the judgment of the trial court terminating
respondent's parental rights because the trial court's fitness and best interest
findings were not against the manifest weight of the evidence.

¶ 2    Respondent, Sharon S., is the mother of B.S. (born May 2011). In May 2022, the

trial court found respondent was an unfit parent under the Adoption Act (see 750 ILCS

50/1(D)(b), (m)(i), and (m)(ii) (West 2020)), and that termination of respondent's parental rights

would be in B.S.'s best interest.

¶ 3    Respondent appeals, arguing that the trial court's fitness and best-interest

determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                 I. BACKGROUND

¶ 5    We note that B.S.'s father, Victor S., has filed a separate appeal. However,

because he and respondent lived together and maintained a relationship throughout this case, we

will discuss facts pertaining to Victor insofar as they are relevant to respondent's claims on appeal.

¶ 6                                    A. Procedural History

¶ 7            In May 2019, the State filed a petition for adjudication of wardship, alleging that B.S. was (1) neglected in that he lived in an environment that was injurious to his welfare "as evidenced by domestic violence between his parents" (705 ILCS 405/2-3(1)(b)) (West 2018)) and (2) abused "in that the minor has been physically abused by his father (*id.* § 2-3(2))." Three days after the petition was filed, the trial court conducted a shelter care hearing and placed temporary guardianship and custody of B.S. with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 8            In October 2019, the trial court conducted an adjudicatory hearing. B.S. testified that he once saw his father choke respondent after "they both got mad at each other, and then they started to kind of fight a little." After B.S. testified, the parties advised the trial court that both respondent and Victor would stipulate to the first allegation in the petition (neglect) and the State would withdraw the second allegation (abuse). The court (1) found that B.S.'s testimony provided a factual basis for the allegation of neglect, (2) accepted the parents' stipulations to the neglect allegation, and (3) adjudicated B.S. a neglected minor.

¶ 9            In November 2019, the trial court conducted a dispositional hearing and found respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor. The court also made B.S. a ward of the court and placed custody and guardianship of B.S. with the guardianship administrator of DCFS. The court admonished respondent that she needed to cooperate with DCFS and complete services or she risked termination of her parental rights. In its written order, the court noted that

the "parents must engage in and show progress in domestic violence services."

¶ 10 In March 2020, B.S. was returned to live with respondent and Victor. However, in July 2020, police officers arrested Victor for a domestic dispute with a friend that occurred in front of B.S. and respondent. After the incident, respondent moved with B.S. out of the residence, reported the incident to the State, and later that month, signed a DCFS safety plan that required respondent and B.S. to stay away from Victor.

¶ 11 In September 2020, respondent returned to live with Victor in violation of the safety plan, leaving B.S. with his maternal grandmother. B.S. was then taken back into DCFS custody.

¶ 12 B. The Petition for Termination of Parental Rights

¶ 13 In July 2021, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent within the meaning of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) due to her (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to B.S.'s welfare, (2) abandoning B.S., (3) deserting B.S. for more than three months prior to the petition's filing, (4) failing to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent within nine months after an adjudication of neglect—specifically, October 2019 to July 2020, and July 2020 to April 2021, and (5) failing to make reasonable progress toward the return of the child to the parent during those same nine-month periods. See *id.* §§ 1(D)(b), (a), (c), (m)(i), (m)(ii).

¶ 14 1. *The Fitness Portion of the Termination Proceedings*

¶ 15 In January 2022, the trial court conducted a hearing on the parental fitness portion of the termination proceedings. At the beginning of the hearing, the court, at the State's request, took judicial notice of all orders previously entered, including the adjudicatory and dispositional

orders without objection.

¶ 16                                    a. Alyse Borla

¶ 17         Alyse Borla testified that she previously worked at Family Service Center (FSC) and was the caseworker on this case from August 2019 to November 2020. Borla stated that, after her involvement, the case was transferred to a different agency—the Center for Youth and Family Services (CYFS)—to avoid a conflict of interest because B.S.'s foster parent at that time, who was his maternal grandmother, "knew" a supervisor at FSC.

¶ 18         Borla testified that in October 2019 she established a "service plan" that required respondent and Victor both to (1) cooperate with the agency, (2) complete domestic violence classes, (3) maintain appropriate housing and income, (4) attend visits with B.S., (5) engage in mental health services, and (6) complete parenting classes. Victor was also required to complete a substance abuse assessment. Borla testified that she discussed the service plan with respondent and Victor and they both appeared to understand that they needed to complete the services.

¶ 19         Regarding visitation, Borla stated the following.

        "So[,] in the beginning, visitation was weekly. It was supervised at our agency. I believe it started out being two hours per visit. And then about six months in[,] when [the] parents were doing well with their services, we increased visits to twice a week. They were moved into the home, and then they were moved to unsupervised later down that road [in January 2020.]"

¶ 20         Borla testified that B.S. was "returned home" in March 2020, and remained there until July 2020, at which time a "domestic dispute" occurred between Victor and a friend who was in the home at the time. Borla testified that B.S. had been "just returned home to mom [(respondent)] and we put a safety plan in place." The safety plan required respondent and B.S.

to "not be in Victor's presence." Borla intended to reevaluate the situation after Victor completed his service plan. Borla testified that respondent initially moved out, but in September 2020, respondent violated the safety plan by returning to live with Victor. Before so doing, respondent notified Borla that she "went and moved back in with Victor." Respondent left B.S. with her parents, and B.S. was taken back into care.

¶ 21        Regarding respondent's performance on her service plan from October 2019 to July 2020, Borla testified that respondent completed parenting classes and domestic violence classes. Additionally, although respondent engaged with counseling, she did not successfully complete counseling.

¶ 22        As for Victor's progress from October 2019 to July 2020, Borla testified that he also made most visits but completed only the parenting classes and not the domestic abuse classes because he was forced to restart the classes after the incident in July 2020, despite having completed the majority of the classes. Victor tested positive for marijuana during substance abuse assessments but because marijuana was being legalized at the time, substance abuse classes were not recommended.

¶ 23        Regarding the second nine-month period from July 2020 to April 2021, Borla testified that she rated respondent's performance on her service plan during that period "unsatisfactory" because respondent violated the safety plan by returning to Victor in September 2020.

¶ 24        Borla further testified that, up until October 2020, respondent and Victor "were very good with contact. *** They were very involved." But Borla stated "when [respondent] went back to Victor, that things kind of went downhill there. They came so far, and I think it was just a really big setback that they maybe couldn't come back from. So that was—it was hard to

contact them around that time." Borla attempted to contact the parents by phone, text, and in person. Borla explained to respondent that if respondent continued to live with Victor, they would both have to successfully complete their services in order to have B.S. returned to them. Borla believed that respondent understood that if one of them failed, neither parent would get B.S. back.

¶ 25　　　　Borla also testified that during the second nine-month period, she had "reestablished" mental health counseling for respondent, but respondent was "inconsistent" with counseling and did not complete the service. As for Victor, during the second nine-month period following the July incident, Victor did not complete domestic violence classes or substance abuse classes, which were required after he tested positive for cocaine in September 2020.

¶ 26　　　　On cross-examination, Borla was asked about the incident in July 2020 that caused respondent and B.S. to move out of their house. She said that Victor had told her he was in his house with a friend and caught the friend doing drugs in the bathroom. Victor tried to physically force the man out of the house and ripped his friend's shirt in the process. The incident took place in front of B.S. and respondent. Borla talked to B.S. about the event, and he told her that he was very scared that there was fighting and hitting.

¶ 27　　　　　　　　　　　b. Pua Deshmukh

¶ 28　　　　Pua Deshmukh testified that she was the caseworker from November 2020 until October 2021. Deshmukh made no changes to the service plan other than to add a life skills class at respondent's request. Respondent engaged in that class "a little bit," but did not complete it.

¶ 29　　　　The communication with both parents was spotty, but they would eventually return her phone calls. Deshmukh said that while she was assigned to this case, Victor completed anger management classes. However, at a meeting to review the service plan in May 2021,

Deshmukh rated both parents' progress as unsatisfactory because they had not completed all of the services.

¶ 30        Regarding respondent's maintaining a source of income, respondent told Deshmukh that she was working and received disability benefits. However, she never gave Deshmukh proof of those sources of income.

¶ 31        Regarding visits, Deshmukh said that they started off as virtual and in person, "virtual one week, in person the next, two hours each time." But eventually they became weekly with two hour in-person visits, which Deshmukh "supervised quite a few of." Respondent and Victor would arrive together but insist they were not a couple. However, B.S. told Deshmukh that "they were together." Deshmukh testified that the quality of the visits "kind of all seemed like surface level. *** There [were] a couple times [B.S.] called [his] foster parent [']mom,['] and both parents didn't like that and told him he couldn't call her that. *** There was no connection it seemed like."

¶ 32        Deshmukh recalled that during one visit in 2021, "we all kind of just got to chatting, and [Victor] had just mentioned how he had made some poor choices back in the day and how he had choked out [respondent] and a couple other things." A case aid then stepped in to say "[w]e're not allowed to be talking about stuff like that in front of [B.S.]" Victor then apologized. Deshmukh testified "that was the last time it happened."

¶ 33        Although communication was sporadic, Deshmukh never had to "track down" the parents to get ahold of them. Regarding drug drops, of the 42 scheduled drops, respondent appeared only 9 times. Of Victor's 42 random drug drops, he appeared only 8 times.

¶ 34        On cross-examination, Deshmukh said that Victor was not cooperative in terms of communication, visits, or drug drops. He was gone most of the time, working on jobs out of

town, "getting paid under the table [and missing] visits knowing that they were scheduled for that day." Victor did complete parenting and anger management classes, but he still had not completed substance abuse classes, which were required after Victor tested positive for cocaine in September 2020.

¶ 35        Around September 2021 Deshmukh repeatedly told Victor to call Family Guidance, a substance abuse treatment provider, to make an appointment to get into the substance abuse classes. At some point, Victor "was established for outpatient" there, but because he did not engage with the classes he was unsuccessfully discharged and had to wait 28 days to restart the classes. Deshmukh asked Victor multiple times to restart classes and he always said he would do it. However, Deshmukh never got confirmation that Victor completed the classes.

¶ 36        Deshmukh recalled one instance in which respondent and Victor sent her "very disrespectful" texts after a visit was cancelled in September 2021 because the case worker, who was meant to supervise the visit, was sick with COVID-19. Deshmukh found out about the cancellation with only 30 minutes notice, at which time respondent and Victor called her to see if she could still make the visit happen. She told them that she already had a full schedule, but she would see what she could do. At that point, they started "blowing up [Deshmukh's] phone being very disrespectful, and [she] was getting cussed out on both angles."

¶ 37        However, Deshmukh did "end[ ] up making it work, and [she] texted both of them[,] telling them [she] was at the office with [B.S.]" She further testified that the policy was to wait only 15 minutes for parents to show up but she gave Victor and respondent 30 to 45 minutes that day after talking to them "an hour beforehand." Nonetheless, neither parent showed up to the visit. Respondent texted Deshmukh back four days later, saying she just saw

Deshmukh's message about the visit; and Victor never responded.

¶ 38 On cross-examination, Deshmukh testified that respondent's service plan from November 2020 to May 2021, was rated unsatisfactory because of her failure to complete domestic violence classes, give drug drops, cooperate with the agency, visit with B.S., and maintain appropriate income and housing. Respondent never tested positive for any illegal substance. Although she had completed domestic violence classes when Borla was her caseworker, respondent was told to redo them, but she never did. Deshmukh said that at one point, respondent moved out of Victor's home and said she moved in with a friend. However, Deshmukh was never able to get in touch with that friend to do a home safety check to verify whether respondent was living there.

¶ 39 When asked whether "[d]uring [her] time on the case, was there ever a time when [she was] close to returning the child back to [the parents]," Deshmukh answered, "No."

¶ 40 c. Megan Graham

¶ 41 Megan Graham testified that she was the current caseworker and received the case in October 2021. She testified, "[S]ince I've had the case, it looks like nothing had been done. They have not contacted me about their services since I've taken the case over in October [2021]."

¶ 42 In November 2021, the parents had only a one-hour visit with B.S. because they had not made any progress with their services. During Graham's time on the case, respondent and Victor had been uncooperative. It took a lot of "teeth pulling" to get a hold of them. The only time Graham heard from them was when they had a visit with B.S. She repeatedly asked respondent and Victor how they were doing with their services, but they did not answer her until they were ready to visit with B.S.

¶ 43        Graham had scheduled random drug drops for the parents, but they missed all but one, which was in December 2021. Respondent's test was negative, and Victor's test was positive for marijuana use.

¶ 44        Graham said that she had supervised only one visit, but in her opinion both parents were very inappropriate at that visit. Victor showed up to the visit smelling very strongly of marijuana. Respondent then told B.S. that she had a friend of hers "spy" on him while he was in his foster parents' backyard. Respondent said that her friend saw B.S. catch something on fire in the backyard. B.S. said, "I don't know what you're talking about." At the same visit, B.S. and Victor were playing a game where B.S. had to guess what word Victor was thinking about by giving B.S. hints with other words. The word Victor chose was a swear word, but she could not remember which word it was.

¶ 45        Graham also testified that Victor had been on Facebook asking people for money, gas, and a place to stay. He and respondent were sleeping in his car and in motels. Graham said that since she had been working on this case, she never felt that she could recommend returning B.S. to either parent.

¶ 46                            d. Respondent

¶ 47        Respondent testified that from 2019 until April 2020, she always cooperated with Borla and always stayed in communication with her. She had completed parenting classes and a substance abuse assessment. No services were recommended from that assessment, but Borla still required her to take drug drops. According to respondent, she "completed" her drops.

¶ 48        Borla told her that she did not have a substance abuse problem, which respondent opined was why she may have started missing drops later on in the case. She also missed drops because she was out of town and the drops were random. However, she did complete some of the

other drops.

¶ 49       She provided Borla with her proof of income by giving Borla her social security benefits information. Borla also required respondent to have suitable housing, which she did. She also regularly attended counseling during the time Borla was her caseworker. Respondent said that starting in April 2020, counseling was only available via Zoom, and she was not "tech savvy," so that was a problem. However, she did attempt to attend counseling online.

¶ 50       Respondent testified that in April 2021, when Keshmukh was her caseworker, Keshmukh re-signed a referral for her to get back into counseling, and she had been going ever since. Respondent said it was her own idea to add life skills classes to her service plan and she did attend it for a while.

¶ 51       When respondent was asked why she left B.S. with her parents in September 2020 and returned to live with Victor, she explained as follows:

"My mother was my payee at the time. I felt trapped in a way being there. I left probably on not my best judgment to leave [B.S.] there, but he had stayed with my mom several times. I thought that would be okay, and I was later on going to get a place for [B.S.] and I, and we could all be together."

¶ 52       When asked if there had been any domestic violence between Victor and her since this case started, respondent said the following:

"No. I was off my bipolar medicine, and I have said things that were not true. I went to the Sojourn house. I was off my meds, not in the right frame of mind, probably not the best for [B.S.] either, and we went to the Sojourn house, and then we left there, and then we went back, so we were there two different times, but I was not on my meds. I become very irrational when I'm off of them."

¶ 53　　　　　Respondent said that she was currently on her medication. According to respondent, she had completed all of the services that were required of her.

¶ 54　　　　　On cross-examination, respondent said that the agency never told her if she could go back and live with Victor after the July 2020 incident. Instead, she was told to stay away from him if she wanted to get B.S. back. She then acknowledged that she did not stay away from Victor.

¶ 55　　　　　When asked if she remembered why B.S. came into care, respondent responded, "I was off of my medicine like I stated. I said [Victor] had put his hands on me, and I said a whole bunch of other stuff, and my son and I went to the Sojourn house." She said she went with B.S. to the Sojourn house on two occasions.

¶ 56　　　　　Respondent testified that she remembered admitting at the adjudicatory hearing that "at one time [Victor] and I both put our hands on each other." Respondent stated that in September 2020, she knew she should not go back to Victor because the agency said it was a bad idea. Like Victor, respondent also blamed her mother for B.S.'s removal, stating "it was my mother *** who called and said I abandoned [B.S.] when he was still staying at their home."

¶ 57　　　　　　　　　　　　　　　　e. Victor S.

¶ 58　　　　　Victor testified that he had been residing at the Midtown Inn with respondent for the last three months. He said that at the time B.S. was returned home in March 2020, he had completed all the tasks in his service plan except anger management. Victor was not employed because he received social security disability payments each month. According to Victor, he provided his caseworker with a copy of his disability benefits at one point. From the time the case began until March 2020, he had visits with B.S. twice a week. Before the July 2020 incident, Victor had completed 22 out of 26 of his domestic violence classes but said that after

- 12 -

the incident he was required to restart the classes. Subsequently, he found alternative classes offered through a church, which he completed in April 2021. Victor stated that those classes taught him how to handle his temper and the various forms that abuse can take.

¶ 59    According to Victor, he cooperated with toxicology screens ordered by the agency. Victor admitted to using cannabis recreationally and that he consistently tested positive for it. In September 2020, he tested positive for cocaine but asserted he had never knowingly used cocaine, explaining, "At that time that I was tested, I had went [*sic*] to a Christmas party, and I indulged in smoking marijuana with people that I did not know, and I didn't know if there was anything else in it."

¶ 60    On cross-examination, the State pointed out that Victor tested positive for cocaine in September and questioned whether he really attended a Christmas party. Victor answered, "It was just a barbecue I went to." Victor testified that he did not miss any drug tests but after further questioning, admitted that he could have missed several.

¶ 61    When asked why he was staying in a motel, Victor said that his landlord evicted him, but he was saving up money to rent a new house. He believed that he was a fit parent, had a close relationship with B.S., and B.S. was always happy to see him at visits.

¶ 62    Regarding the July 2020 incident, Victor admitted that although he learned anger management techniques from his classes, he did not control his temper when he grabbed his friend's shoulders, ripped his shirt, and threw him out of his house, resulting in Victor's arrest. Victor also admitted that respondent and B.S. were home at the time of the incident.

¶ 63    When asked why B.S. was taken into care, Victor blamed his mother-in-law, who allegedly called DCFS. He said, "[A]pparently she made a call to the right people to get stuff done for her." Victor testified that he did not recall B.S. saying that Victor had struck him and

denied that any domestic violence had occurred in his house when B.S. was taken into care. However, Victor acknowledged that respondent went with B.S. to live at Sojourn House, which was a place that provided safety for victims of domestic violence. On re-direct examination, respondent continued to say that he had never been physically violent with his wife or B.S. However, Victor acknowledged that he engaged in verbal abuse and said that was inappropriate.

¶ 64                                    f. Amy Varner

¶ 65          Amy Varner testified that she was Victor's sister. Varner said that before DCFS got involved, she visited Victor, respondent, and B.S. around three times a week and had never witnessed her brother being violent with respondent or B.S. Varner testified that she never witnessed any parenting that was inappropriate. In fact, she never even saw Victor scold B.S. Varner further testified that Victor had never hurt her or been inappropriate with other family members, either. Varner acknowledged that she had seen Victor use marijuana recreationally but never to excess and never in front of B.S. When asked if she had seen any positive changes in Victor throughout his involvement with DCFS, Varner said, "There wasn't really changes to be had."

¶ 66                              g. The Trial Court's Decision

¶ 67          In May 2021, the trial court conducted a hearing to issue its ruling. The court began by stating that it took judicial notice of a stipulation of facts from October 2019, which specified, among other things, "domestic violence reports between the parents," some of which "occurred before the minor."

¶ 68          The trial court found by clear and convincing evidence that the July 2020 incident was an instance of domestic violence. The court then stated the following:

          "In regards to the July '20 incident, there was substantial testimony by the

father about what happened. There was also testimony by Ms. Borla in relationship to what the minor said happened and how he felt about it. And that is the basis for my finding of the significance of the July '20 incident. And I think the September of '20 return of the child to the Department of Children and Family Services and reengagement by mother and father as a couple also was a very significant event in the course of this case."

¶ 69   The trial court found Borla to be credible and helpful, quoting her testimony that "when [respondent] went back to Victor, things kind of went downhill from there." Important to the court was Victor's testimony regarding the July 2020 incident. The court noted that Victor (1) did not believe the incident was domestic violence and (2) felt that he was being treated unfairly by having to take a whole new domestic violence class. The court recognized that Victor admitted that he handled the situation inappropriately and did not follow through with the training he had received.

¶ 70   The trial court also stated that it found "more troubling" the fact that "[Victor] continued to minimize and *** there was no realization of the domestic violence that was occurring or insight into how to avoid it." The court also found the positive drug test for cocaine to be concerning because Victor did not adequately address why he tested positive. The court noted that Victor stated he somehow consumed cocaine at a Christmas party but after being asked how that could have been because the test was in September, he changed his story.

¶ 71   The trial court also found important that respondent "went in with open eyes and violated the safety plan ***. And she did that knowingly and with, once again, no insight into what domestic violence does to children." Further, the court noted that respondent did not seem to recognize what domestic violence was and that the counseling did not adequately address the

issue.

¶ 72    The trial court made individual findings that the State had proved by clear and convincing evidence that both Victor and respondent were unfit because they failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare, (2) make reasonable efforts to correct the conditions which were the basis for removal of the minor during the relevant nine-month periods, and (3) make reasonable progress toward the return of the minor to each of them within nine months after an adjudication of neglect under the Adoption Act.

¶ 73    The trial court then entered a written order finding respondent unfit under sections 1(D)(b), (m)(i), and (m)(ii) of the Adoption Act (750 ILCS 50/1(D)(b), (m)(i), (m)(ii) (West 2020)) and continued the case for a best interest hearing.

¶ 74        2. *The Best-Interest Portion of the Termination Proceedings*

¶ 75    Later in May 2022, the trial court conducted the best interest hearing.

¶ 76            a. Meghan Graham

¶ 77    Graham testified that she was the current caseworker for B.S. and that he had a fictive kin placement with Jennifer and Scott Miller for "about two going on three years." She opined that B.S. was doing very well at the placement and he was thriving. Graham further testified that she personally observed the bond that the foster family had with B.S. She stated, "They go out on outings all the time together. They go on family vacations. The foster family has included [B.S.] in family photos, family outings, family gatherings. He calls the foster parents mom and dad. And he calls his foster siblings brother and sister." The Millers would adopt B.S. if given the opportunity and had already adopted other foster children. She further stated that she believed it would be in B.S.'s best interest to terminate respondent and Victor's parental rights.

¶ 78 Graham stated, "I've just seen [B.S.] thrive. Since I've taken the case over in October, he's just been thriving. He's happy where he is, and I just, I really think this would be the best place for him."

¶ 79 Graham was also asked whether any incidents of domestic violence occurred during the life of the case. She responded that based on her reading of the investigation report, two incidents had occurred. She did not remember the first incident between respondent and Victor very well. However, regarding the second incident, she stated that "[Victor] got into an argument with his roommate and also physically hurt [B.S.]" and "[Victor] was extremely angry after the argument with his roommate, which then was cause to hurt [respondent] and [B.S.]"

¶ 80                                        b. Respondent

¶ 81 Respondent testified that she could care for B.S.'s physical safety and foster his identity and his development of his identity. She said that she believed B.S. felt love and attachment for her. She explained, "When we are all together, when we have gone on vacation with each other to Florida. We've done things like that as a family. And he's always hugging on me, trying to give mom high-fives, and dad." Respondent further said that she believed B.S. would be crushed if he could not see her and Victor anymore.

¶ 82                                  c. The Trial Court's Ruling

¶ 83 Initially, we note that during closing arguments, respondent pointed out that some of Graham's testimony regarding the July 2020 incident was not accurate. The guardian *ad litem* agreed that "there was testimony [during the hearing] that was different or at least supplemental that [he] didn't hear the first time."

¶ 84 The trial court began its decision by stating that it found Graham's testimony regarding the July 2020 incident to be "inaccurate" and would not "rely on that new

information." However, the court found Graham's testimony regarding the foster parents to be credible.

¶ 85    The trial court then emphasized that respondent and Victor did not demonstrate that they recognized "the dangers of domestic violence." The court stated the following:

"So physical safety, development of child's identity, culture, familial, religious background, and ties; I mean, all that. If you live in a home that has domestic violence, none of that develops. And I'm absolutely positive [domestic violence] is not going on in the foster parents' home. I do believe there is bonding with the foster parents. I do believe that he calls them his family.

I think he has two families, but this is the nurturing family when I look at it, the foster parents. Not only that, but I think they're uniquely able to deal with the problems [B.S.] will suffer from because of his home life previously and just the sheer fact that he's a foster kid. They've already adopted two kids. He has people that act as his family and his brothers that are in the same situation as him. I can't think of a better situation to place this kid in because of the fact that all of the necessary—I don't want to say training—but all the necessary attributes and support that he needs he's already gone through in that placement.

And I'm very impressed that the foster parents are not only, you know, foster parents to [B.S.] but are foster parents to two other children of like situation. I believe that there was evidence to a level of preponderance in regards to the bonds with that family, the fact that the child is doing well, that he has become part of that family."

¶ 86    The trial court concluded its ruling by finding that termination of respondent's

and Victor's parental rights was in B.S.'s best interest.

¶ 87       This appeal followed.

¶ 88                          II. ANALYSIS

¶ 89       Respondent appeals, arguing that the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 90                   A. The Trial Court's Fitness Finding

¶ 91       We first note that we can affirm the trial court's fitness determination on any ground that the trial court found respondent unfit. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 33. Accordingly, because we conclude that respondent failed to make reasonable progress towards B.S.'s return during the nine-month period of July 2020 to April 2021, we address only that ground for unfitness.

¶ 92                   1. *The Applicable Law and the Standard of Review*

¶ 93                       a. The Standard of Review

¶ 94       A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48, 187 N.E.3d 763. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30, 125 N.E.3d 444.

¶ 95                   b. The Law Regarding Reasonable Progress

¶ 96        The State must prove unfitness as defined in section 1(D) of the Adoption Act

(750 ILCS 50/1(D) (West 2020)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939,

¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a

parent who fails to make "reasonable progress toward the return of the child" during any

nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West

2020). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's

reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with

the service plans and court's directives in light of the condition that gave rise to the removal of

the child and other conditions which later become known that would prevent the court from

returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36, 157

N.E.3d 493 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001)).

¶ 97        Likewise, this court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court,
>
> based on the evidence before it, can conclude that the progress being made by a
>
> parent to comply with directives given for the return of the child is sufficiently
>
> demonstrable and of such a quality that the court, in the *near future*, will be able
>
> to order the child returned to parental custody. The court will be able to order the
>
> child returned to parental custody in the near future because, at that point, the
>
> parent *will have fully complied* with the directives previously given to the parent
>
> in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218
>
> Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

See also *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 98                                    2. *This Case*

¶ 99        In the present case, the trial court found respondent unfit for failing to make reasonable progress from July 2020 to April 2021, because respondent did not complete her service plan during that time. Respondent argues that this finding was unreasonable because "it was clearly evident that progress toward B.S.'s return home had been made."

¶ 100       At the core of this case are respondent's decisions, time and time again, to choose Victor over her son's safety and well-being, despite the danger Victor's violent behavior posed to B.S. On at least two occasions, B.S. witnessed Victor's violent acts against respondent and, on another occasion, against a man staying with the family. Victor's choking respondent and threatening B.S. was the reason this case was opened in the first place. Although respondent completed some of her services, she (1) decided to violate the safety plan in order to live with Victor, (2) effectively discontinued counseling, and (3) failed to demonstrate that she understood what domestic violence was and how it negatively affected B.S. Given this context, we conclude, as did the trial court, that respondent did not make reasonable progress towards B.S.'s return.

¶ 101       Respondent attempts to downplay the impact that her violating the safety plan by returning to Victor had on this case. However, as Borla said (and the trial court agreed), "things kind of went downhill from there." Borla explained to respondent that if she continued to stay with Victor they would both have to be successful in order to have B.S. returned to them. Neither respondent nor Victor completed their services, yet respondent chose to live with Victor anyway. Notably, respondent did not complete domestic violence classes and she did not follow through with counseling. Both of these services were important to (1) respondent's understanding of how domestic violence affected her and B.S. and (2) respondent's ability to keep B.S. physically and emotionally safe. The record shows that both parents minimized the violent environment to which they exposed B.S., denying that domestic violence had occurred at all.

¶ 102 Further, respondent's communication while Deshmukh was the caseworker was spotty, and respondent failed to appear for the majority of her drug tests. On their own these failures may appear minimal, but when viewed in context of respondent's repeated failure to put B.S. first in her decision-making, the inability to simply maintain good communication and appear for drug tests takes on more significance.

¶ 103 Accordingly, we conclude that the trial court's fitness finding was not against the manifest weight of the evidence.

¶ 104 B. The Trial Court's Best Interest Finding

¶ 105 1. *The Applicable Law and the Standard of Review*

¶ 106 At the best interest portion of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) [T]he child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th)

190537, ¶ 32, 147 N.E.3d 953.

See also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 107        A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 108                                    2. *This Case*

¶ 109        Respondent argues that the trial court's best interest finding was against the manifest weight of the evidence because (1) the State presented insufficient evidence to meet its burden to prove termination was in B.S.'s best interest and (2) the trial court's decision was based largely on permanence, which respondent notes is "only one of the ten factors" the court must consider. Respondent further argues that Graham provided inaccurate testimony and was biased. Specifically, respondent contends Graham's testimony that Victor had hit B.S. during the July 2020 incident was false and Graham made several other statements that respondent characterizes as exaggeration.

¶ 110        Although we agree with respondent—as did the trial court—that Graham's testimony regarding the July 2020 incident was inaccurate, we disagree that her testimony or the court's emphasis on permanence rendered the trial court's best interest finding against the manifest weight of the evidence.

¶ 111        The record shows that the trial court did not base its best-interest determination on Graham's testimony regarding the July 2020 incident. Instead, it found her testimony regarding

B.S.'s foster care placement credible and helpful. We will not substitute our judgment for that of the trial court on the issues of witness credibility, the weight to be afforded to evidence, or the inferences to be drawn from that evidence. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 65.

¶ 112 Graham testified that (1) the Millers planned to adopt B.S., (2) B.S. had been living with them for over two years, (3) he was thriving with the Millers, (4) he was safe and free from domestic violence, (5) the Millers had already adopted other children, giving them experience with foster children, and (6) Graham had personally witnessed the bond between B.S. and the Millers as well as the bond between all of the foster family members and B.S. Further, Graham said that the foster family took B.S. with them on family outings and vacations. B.S. was also included in family photos. He called his foster parents "mom" and "dad" and he called his foster siblings "brother" and "sister." Because of her observations, Graham opined that respondent was not capable of keeping B.S. physically safe and it would be in B.S.'s best interest for respondent's rights to be terminated.

¶ 113 Based on respondent and Victor's testimony, the trial court found that neither of the parents recognized the dangers of domestic violence or how "physical safety, development of child's identity, culture, familial, religious background, and ties" do not develop in that environment.

¶ 114 Given these factual findings, we conclude that the trial court's best-interest determination was not against the manifest weight of the evidence. Accordingly, we affirm the court's judgment terminating respondent's parental rights.

¶ 115                                III. CONCLUSION

¶ 116 For the reasons stated, we affirm the trial court's judgment.

¶ 117 Affirmed.