NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231237-U

NO. 4-23-1237

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 21, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
| Petitioner-Appellee, | ) | No. 21JA26 |
| v. | ) | |
| Champaine W., | ) | Honorable |
| Respondent-Appellant). | ) | Derek G. Asbury, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court granted appellate counsel's motion to withdraw and affirmed
the trial court's judgment where no meritorious issues could be raised on appeal
that the court's fitness and best interest findings were against the manifest weight
of the evidence.

¶ 2    In April 2022, the State filed a petition to terminate the parental rights of respondent

Champaine W. to her minor child, S.R. (born in 2021). In September 2023, the trial court found

respondent was an unfit parent under the Adoption Act (see 750 ILCS 50/1 (West 2022)) and that

termination of respondent's parental rights was in S.R.'s best interest.

¶ 3    Respondent appealed. Thereafter, respondent's appointed counsel moved to

withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing respondent's appeal

presents no potentially meritorious issues for review. We grant the motion and affirm the trial

court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5        Respondent and Albert R. are the biological parents of S.R. Both parents were parties to the proceedings below. Albert R. has separately appealed the termination of his parental rights in appellate court case No. 4-23-1238. Accordingly, this disposition is limited to addressing respondent's potential claims on appeal.

¶ 6              A. The State's Petition for Adjudication of Wardship

¶ 7        In January 2021, the State filed a petition for adjudication of wardship. The State alleged S.R. was neglected because she lived in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2020)). Specifically, the State alleged (1) respondent consumed alcohol throughout her pregnancy and stopped just two weeks before giving birth to S.R., resulting in S.R. suffering from microcephaly, (2) respondent had not properly addressed her substance abuse issues, (3) respondent repeatedly contacted the police regarding her other children, including at least four times in October 2020, (4) respondent was involved in numerous incidents of domestic violence involving Albert R. and her other children, (5) respondent was twice involved with the Intact Family Services Program of the Illinois Department of Children and Family Services (DCFS), (6) respondent was indicated by DCFS four times prior to the initiation of the instant case, and (7) Albert R. was indicated by DCFS prior to the initiation of the instant case.

¶ 8        In April 2021, the trial court adjudicated S.R. neglected (*id.*). At the dispositional hearing held the same day, the court found respondent unfit for reasons other than financial circumstances alone to care for S.R., made her a ward of the court, and placed her guardianship and custody with DCFS. The court found respondent's "substance abuse issues, domestic violence, prior indicated findings of risk of physical injury, and possible mental health issues" formed the basis for her unfitness.

¶ 9                                B. The State's Termination Petition

¶ 10          In April 2022, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit person within the meaning of the Adoption Act for failing to make reasonable progress toward S.R.'s return during the nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)). The State alleged a nine-month period of June 22, 2021, to March 22, 2022 (the relevant time period).

¶ 11          C. The Fitness Portion of the Termination Proceedings

¶ 12                                1. *The State's Evidence*

¶ 13          In June 2023, after numerous continuances, the trial court held the hearing on the fitness portion of the termination proceedings.

¶ 14                                a. The Testimony of Maria Peters

¶ 15          Lutheran Social Services of Illinois (LSSI) child welfare specialist Maria Peters was the assigned caseworker from June 22, 2021, until mid-December 2021. Respondent reported completing a parenting class but did not provide Peters a copy of the completion certificate. Respondent was discharged from domestic violence classes in November 2021 and was referred again in December 2021. Respondent was referred to individual counseling prior to the relevant time period but was unsuccessfully discharged during the relevant time period (on June 29, 2021). Peters referred respondent to individual counseling again in December 2021, but respondent did not complete it while Peters was the caseworker. Respondent was required to do drug tests twice per month but only completed one, on September 9, 2021, which tested positive for tetrahydrocannabinol (THC).

¶ 16          Peters attempted an unannounced visit at the foster home on July 27, 2021, but learned S.R. was at respondent's home at the time, even though she was unfit and not permitted to

have unsupervised visits. When Peters attempted to take S.R. from respondent's home, respondent took S.R. away from Peters, ran inside, locked the doors, and began screaming. After police officers arrived, respondent placed S.R. in her car seat outside the door of the apartment for Peters to take her.

¶ 17    Peters observed a visit on August 2, 2021, during which respondent became agitated while hearing another of her children talking about the foster home. Respondent tried to feed S.R., but S.R. would push the bottle away. Respondent then stopped trying to feed S.R., who began crying. Respondent put S.R. in the car seat and told her to go to sleep if she was going to cry. S.R. remained in the car seat for about half of the visit. At one point, respondent picked S.R. up by her arm, which alarmed Peters given S.R.'s small size. Respondent spent most of that visit on the phone. When Albert R. arrived, respondent left the visiting area and began arguing with him.

¶ 18    Peters described respondent's and Albert R.'s cooperation with the agency as "not very good." According to Peters, respondent explained her difficulty completing services was due to transportation and mental health issues, specifically, anxiety with leaving her home. During her time as the caseworker on this matter, Peters never felt it was safe to return S.R. to her parents. This was because "[n]either were complying with services to correct any of the conditions that brought [S.R.] into foster care in the first place."

¶ 19                b. The Testimony of Gerald Suelter

¶ 20    Peoria police officer Gerald Suelter responded to a violent incident involving respondent at her apartment building on October 20, 2021. A woman reported being battered by a tenant of the building. Suelter noticed a chunk of the woman's hair had been pulled out. Suelter identified respondent as the other individual involved in the incident. Respondent "appeared to be

extremely intoxicated, and she was hard to talk to." Respondent was slurring her words and had an empty alcohol bottle next to her.

¶ 21                                   c. The Testimony of Ma'Lachi Jimoh

¶ 22        LSSI permanency achievement specialist Ma'Lachi Jimoh was the assigned caseworker from February 14, 2022, to April 7, 2022. On March 7, 2022, Jimoh referred respondent to domestic violence classes. Respondent was previously unsuccessfully discharged from this service and failed to complete this service by the end of the relevant time period. Respondent had stable housing during Jimoh's time as the caseworker and completed parenting classes. Respondent did not complete any drug testing during Jimoh's time as the caseworker. Respondent completed a mental health assessment in January 2022 and only "sporadically" participated in individual counseling thereafter.

¶ 23                                   2. *Respondent's Evidence*

¶ 24        Respondent testified she had not completed individual counseling by the end of the relevant time period but maintained she was regularly attending counseling. Respondent stated she attended all her visits with S.R. and described them as "amazing."

¶ 25        The trial court then took the matter under advisement.

¶ 26                                   3. *The Trial Court's Fitness Determination*

¶ 27        In September 2023, the trial court found respondent unfit as alleged in the State's termination petition. The court noted respondent missed 13 consecutive drug tests between September 2021 and March 2022, despite being required to complete 2 per month. The court also noted respondent was unsuccessfully discharged from domestic violence classes and individual counseling and failed to complete either despite being referred again to both.

¶ 28        The trial court also found the following:

"So when I look at it objectively during these nine months and I look at the services—I'm trying to do \*\*\* this as fair as I can. When I look at what they order and what was done, almost the majority if not all of the things that were ordered to do were not completed during this nine-month period. I can't find that under the rules applied by the Supreme Court and under the statute that that is reasonable progress. The caseworker testified directly that during this nine-month period the child was not going to be returned home or close to being returned home because the services weren't done.

\*\*\* [W]ith all these things asked to do if you maybe do one or two of ten that is not reasonable progress."

¶ 29    The trial court then proceeded to the best interest hearing.

¶ 30    D. The Best Interest Portion of the Termination Proceedings

¶ 31    1. *The State's Evidence*

¶ 32    As reflected in the best interest report and testimony of LSSI child welfare specialist Kayla Hanten, S.R.'s foster mother, Marisa W., was able, willing, and committed to provide permanency to S.R. through adoption. S.R. had been with Marisa since August 2022. Marisa met S.R.'s food, shelter, health, and clothing needs. Hanten observed the home to be safe and to have adequate space. S.R. had an appropriate sleeping space within the home. S.R. was continuing to attend Eastside Educational Center. Respondent was not always attending her scheduled visits, and S.R. did not have a visible bond with respondent when she did visit. By contrast, S.R. and Marisa had developed a significant parent/child bond. In addition to respondent not completing her drug tests, Hanten noted in her report:

"[T]here have been concerns reported by [respondent's] counselor regarding her behavior and attitude that have 'seriously declined'. The agency has concerns regarding [respondent's] reported anxiety and her ability to manage her emotional health in order to care for [S.R.] [Respondent] has reported that her anxiety is debilitating and that it hinders her from leaving her home, bringing up concerns of [her] ability to effectively meet [S.R.'s] needs."

¶ 33        Hanten believed it was in S.R.'s best interest that respondent's parental rights be terminated and the permanency goal changed to adoption.

¶ 34                              2. *Respondent's Evidence*

¶ 35        Respondent testified that S.R. smiles, runs to her, and hugs and kisses her when they first see each other at visits. S.R. and respondent both cry at the end of visits, which "[e]verybody at the agency" has seen. S.R. tells respondent not to leave when the visits end. Respondent described her bond with S.R. as "loving, caring, [and] nurturing." Having participated in counseling, respondent felt she was "totally different from two years ago" and "[t]his experience has humbled [her] wholeheartedly." Respondent took "full accountability" for drinking while pregnant and acknowledged she was not a victim of her choices. Respondent felt it was not in S.R.'s best interest "for her to go anywhere but with her mommy and her father and all of our family."

¶ 36                              3. *Additional Testimony of Kayla Hanten*

¶ 37        Hanten was recalled to the stand and testified she never witnessed S.R. cry at the end of a visit and was not aware if S.R. had ever done so. Moreover, respondent only participated in 12 out of 30 visits since February 2023. Hanten acknowledged respondent had shown "growth"

with counseling but still needed to continue to address her anger management issues. Respondent reported not completing drug tests because she thought they were no longer court-ordered (despite Hanten admonishing her in a family team meeting as recently as April or May that it was important for her to complete them to have visits in her home) and not attending visits due to her anxiety issues.

¶ 38    4. *The Trial Court's Best Interest Determination*

¶ 39    The trial court acknowledged respondent's anxiety-related difficulties with maintaining visitation but emphasized it "can't change" the fact that the visits "were sporadic." The court noted S.R. had spent approximately half her life in foster care and that "the heavy lifting" of providing shelter, food, medical care, and education had been done by her foster parent. The court found the State proved by a preponderance of the evidence it was in S.R.'s best interest to terminate respondent's parental rights and changed the goal to adoption.

¶ 40    This appeal followed.

¶ 41    II. ANALYSIS

¶ 42    Appellate counsel has moved to withdraw pursuant to *Anders*, arguing that the appeal of this case presents no potentially meritorious issues for review. See *In re S.M.*, 314 Ill. App. 3d 682, 685-86 (2000) (holding *Anders* applies to termination of parental rights cases and providing the proper procedure to be followed by appellate counsel). Counsel identifies two potential issues for review: (1) whether the trial court's determination that respondent was unfit was against the manifest weight of the evidence and (2) whether the court's determination that termination of respondent's parental rights was in S.R.'s best interest was against the manifest weight of the evidence. As to the unfitness finding, counsel contends there is no meritorious argument respondent made reasonable progress during the relevant time period given her

(1) completion of only parenting classes, (2) failure to complete drug tests or domestic violence classes, and (3) new domestic violence incident, unauthorized unsupervised contact with S.R., and missed visits. As to the best interest finding, counsel contends all the best interest factors favored termination of respondent's parental rights. Counsel provided respondent notice of the motion to withdraw. Respondent has not filed a response.

¶ 43 Because we agree this appeal presents no potentially meritorious issues for review, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 44     A. The Trial Court's Unfitness Finding

¶ 45 Section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2022)) provides a two-step process to involuntarily terminate parental rights. The State must first prove by clear and convincing evidence the respondent is "unfit" as contemplated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re N.G.*, 2018 IL 121939, ¶ 28.

¶ 46 The trial court found respondent failed to make reasonable progress toward the return of the minors during the relevant time period pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)).

> "Reasonable progress is examined under an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. [Citation.] The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent.

- 9 -

[Citation.] Reasonable progress exists when the trial court can conclude that progress being made by a parent to comply with directives given for the return of the minor is sufficiently demonstrable and of such a quality that the trial court will be able to order the minor returned to parental custody in the near future. [Citations.]" *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17.

¶ 47 The trial court is in a superior position to observe witnesses and evaluate their credibility. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). Accordingly, the court's findings regarding parental unfitness are afforded great deference and will not be reversed unless they are against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 48 The evidence presented in this case demonstrates the trial court's unfitness determination was not against the manifest weight of the evidence. Respondent was unsuccessfully discharged from individual counseling and did not complete it during the relevant time period after being referred again. Respondent was also unsuccessfully discharged from domestic violence classes and did not complete them following another referral. Despite being required to complete 2 drug tests per month, respondent only did 1 during the relevant time period, testing positive for THC and missing 13 consecutive subsequent tests. Respondent's substance abuse, while pregnant with S.R., was a significant reason for S.R. coming into foster care. Additionally, respondent was involved in a violent incident, in which she was reportedly extremely intoxicated, with another tenant of her apartment building during the relevant time period. Moreover, respondent also had unauthorized unsupervised contact with S.R., which required police intervention. Respondent's inability to apply whatever skills she learned through her limited participation in services

undermines the notion of having made reasonable progress. See *In re R.L.*, 352 Ill. App. 3d 985, 999 (2004).

¶ 49        In sum, the record adequately supports the testimony from Peters that respondent did not comply with services or correct any of the conditions that brought S.R. into foster care in the first place. Accordingly, we agree with counsel that there are no potentially meritorious arguments that could be advanced on appeal that the trial court's unfitness determination was against the manifest weight of the evidence.

¶ 50                    B. The Trial Court's Best Interest Finding

¶ 51        "If the trial court finds the parent to be unfit, the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). The State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. The preponderance of the evidence standard is a less stringent standard than proof beyond a reasonable doubt; it is less stringent than even the intermediate standard of clear and convincing evidence. *In re K.P.*, 2020 IL App (3d) 190709, ¶ 41 (citing *People v. Peterson*, 2017 IL 120331, ¶ 37).

¶ 52        In evaluating a child's best interest, the trial court must consider the following statutory factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's

- 11 -

community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006); 705 ILCS 405/1-3(4.05) (West 2022).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the child[ ]'s best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 53 The evidence presented in this case demonstrates the trial court's best interest determination was not against the manifest weight of the evidence. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Other factors, such as "the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures" (705 ILCS 405/1-3(4.05)(g) (West 2022)), may properly be considered.

¶ 54 Here, S.R. had spent approximately half of her life in her current placement. The evidence showed Marisa, who was S.R.'s foster mother since August 2022, was willing, able, and committed to providing permanency to S.R. through adoption. The evidence also showed respondent continued to experience anxiety issues, which inhibited her from meeting S.R.'s needs. Marisa, on the other hand, was meeting S.R.'s food, shelter, health, clothing, medical, and educational needs. Hanten testified the foster home was safe with adequate space and an

appropriate sleeping area for S.R. Hanten also testified that respondent was not attending her scheduled visits and S.R. did not have a visible bond with her when she did attend. By contrast, the evidence demonstrated that S.R. and Marisa had developed a significant parent/child bond.

¶ 55    We agree with appellate counsel that no potentially meritorious arguments can be raised on appeal that the trial court's best interest determination was against the manifest weight of the evidence.

¶ 56    III. CONCLUSION

¶ 57    For the reasons stated, we agree with appellate counsel that no meritorious issues can be raised on appeal. We therefore grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 58    Affirmed.